[No. 11057. In Bank. — July 13, 1887.]

# FRANCIS LAMB, Appellant, v. RECLAMATION DISTRICT No. 108, Respondent.

Reclamation District — Right to Erect and Maintain Levee — Overflow of Neighboring Lands — Liability for. — A reclamation district organized and existing under the laws of the state for the purpose of reclaiming certain swamp and overflowed lands situated upon the Sacramento River has a right to erect and maintain a levee along the bank of the river so as to prevent the inundation of the land sought to be reclaimed, notwithstanding the possible or probable effect of the levee would be to cause the waters of the stream to overflow other lands situated upon the river. Damages so caused by the levee several years after its erection, on land situated upon the opposite bank of the river, two miles farther down the stream, are *damnum absque injuria*, for which the reclamation district is not liable.

Id. — Taking Private Property for Public Use — Indirect and Consequential Damages. — Conceding that the reclamation district is a municipal corporation acting under the authority of the state, and that in building the levee it exercised the power of eminent domain, the indirect and consequential damages so caused by the levee do not constitute a taking of the property injured, within the meaning of the constitutional provision prohibiting the taking of private property for public purposes without compensation.

Id. — Levee may be Constructed across Slough. — The reclamation district has a right to construct and maintain the levee across the mouth of a slough through which, in times of flood, a part of the waters of the river was accustomed to flow and escape upon the adjoining low lands.

Appeal from a judgment of the Superior Court of Colusa County.

The facts are stated in the opinion of Justice McFarland.

*J. C. Ball*, and *A. L. Hart*, for Appellant.

*A. C. Adams, Jackson Hatch*, and *W. B. Treadwell*, for Respondent.

McFarland, J. — This is an action to abate and remove as a public nuisance a levee erected by defendant along the west bank of the Sacramento River, and across

a place on said bank called Wilkins Slough, and to
recover damages for the overflowing of plaintiff's land
on the other side of the river, about two miles below,
alleged to have been caused by said levee. The case
was submitted on certain parts of the pleadings taken as
true. The court below gave judgment for defendant,
and plaintiff appeals from the judgment.

The Sacramento River is a large navigable stream,
having its sources near the boundary line between the
states of Oregon and California, and running for several
hundred miles through the northern and central parts
of the latter state to the bay of San Francisco. In times
of high water it frequently overflows its banks. A
great deal of the adjoining land is lower than the banks
of the stream; and at times of overflow the surplus
water runs down to and over such land, where it re-
mains until it evaporates, or, later in the season when
the river is at a lower stage, runs back into the stream.
The water at some places pours over the entire bank in
continuous sheets for considerable distances, but more
commonly finds its way out through the lower parts, or
depressions, of the banks, which of course have gradu-
ally been worn down deeper and wider by the action of
the water. These short depressions by which the water
gets through the banks into the lower lands beyond
are called sloughs; and Wilkins Slough, mentioned in
the complaint, is quite a large depression of that char-
acter, and affords means of escape during overflows for
a considerable quantity of water. The lands thus over-
flowed, and for the protection of which respondent
claims the right to maintain said levee, are a part of
that large body of swamp and overflowed land acquired
by California from the United States by virtue of the
act of Congress of September 28, 1850, generally known
as the Arkansas act.

The respondent, Reclamation District No. 108, is a
public corporation, organized and existing under the

laws of this state relating to swamp and overflowed
lands.   The district includes over forty thousand acres
in the county of Yolo and about thirty-three thousand
acres in the adjoining county of Colusa, all lying west
of the Sacramento River.   The district having been
regularly and legally organized, and engineers employed
by its trustees having performed their duties as re-
quired by law, the plan of its proposed work, with esti-
mates of costs, expenses, etc., was duly adopted and
reported to the boards of supervisors of said two coun-
ties on the twenty-eighth day of September, 1870.   The
plan was, in substance, by a continuous levee, wherever
necessary, along and upon the west bank of the river
from "the Upper Sycamore Slough to Knight's Land-
ing," a distance of over forty miles,—and which, of
course, included the filling of all depressions or sloughs,
—to prevent the water of the river from flowing over
its banks and flooding the lands of the district.   It
mentioned by name the place called Wilkins Slough.
The respondent thereafter commenced to construct its
works in accordance with the said plan, and completed
the same on the first day of December, 1872.   And from
that date it has continuously maintained its levee, ex-
cept that in 1879 that portion of it which was across
said Wilkins Slough was partly washed away, but was
immediately—that is, in the next month—rebuilt to its
original height.   It is admitted that this levee, includ-
ing that part of it constructed across Wilkins Slough,
is necessary and indispensable to the protection of the
lands of said district from overflow; and that without
such protection the overflow would render said lands
unfit for cultivation and uninhabitable.

The complaint—taken as true—avers in substance
that on December 22, 1879, plaintiff was the owner and
in possession of a tract of land fronting on the opposite
or east side of said Sacramento River; that on the 23d
of said month he resided on said land with his family;

that it was a safe and suitable dwelling-place, and valuable for agricultural purposes; and that on or about the 26th of said month he had prepared, cultivated, and seeded with wheat about two hundred acres of said land, and that the remainder was used for alfalfa and grass. It then describes the said Wilkins Slough as situate about two miles above said land, and on the west side of the river, and avers that when unobstructed it divides the water in times of flood, and carries large quantities of it to the southwestward away from the land of plaintiff to a natural basin.   Further averments are, that on or about January 15, 1880, defendant completely obstructed said Wilkins Slough by placing a dam and levee across its head, and thus prevented any water from passing into or through the same, and that by reason of said obstruction, on or about the sixth day of April, 1880, the water did so accumulate in said Sacramento River as to overflow, and did overflow, the easterly bank thereof, and did flood and inundate plaintiff's said land on said easterly bank, and did destroy his said growing wheat, grass, fences, etc., to his damage in the sum of five thousand dollars.   It is further averred that defendant continues and intends to maintain said levee, and that in times of flood it will cause the easterly bank to be overflowed and plaintiff's land to be damaged as aforesaid.

It does not appear when or from what source plaintiff got title to or possession of his land.   It only appears that he was there in December, 1879, and that the alleged damage occurred in April, 1880, which was between seven and eight years after the erection of the levee.

The questions to be determined in the case are, Did respondent have the right to construct the levee which it completed in 1872, notwithstanding the damage which was caused thereby, several years afterward, to appellant's land? and has it the right to maintain said levee, notwithstanding any damage which it may possibly or

probably cause to said land hereafter, as apprehended by appellant and described in his complaint?

It may be remarked that the conclusion that respondent had or has no such right does not follow from the mere fact of damage to appellant's land. The phrase *damnum absque injuria* is just as well recognized, as a statement of a legal condition, as the maxim, *Sic utere*, etc., is, as the statement of a limitation of rights to property. And the words *damnum absque injuria* include a direct declaration in terms of the proposition that there *may be* damage without legal injury. Therefore the reiteration of one or the other of these Latin phrases affords but little aid in the solution of any question. This is well expressed in the text of Wood's Law of Nuisances, p. 21, as follows:—

" But when no right has been violated, it cannot, by any process of reasoning, be established that there is a legal injury or damage. The instances of *damnum absque injuria* are very numerous, and are always injuries that result from a lawful act, for the law never recognizes an injury arising from a lawful act as imputing damages. . . . . In giving force to the maxim, *Sic utere,* etc., the courts are always met by the right of parties to use their own property in every reasonable way, and neither justice nor public policy would tolerate the idea that a person should be made liable for damages resulting from a reasonable use of his property. Therefore, in determining whether or not an injury has been done amounting to a nuisance, it is necessary to balance the rights of the parties, in view of all the circumstances, and say whether or not the use of the property in the manner complained of is reasonable and in accordance with the relative rights of the parties."

The real question in such cases is, Had the party sued the right to do the thing complained of?

Respondent has at least as much right to maintain the levee as a natural person owning lands of a charac-

ter similar to those of respondent's district would have; and its counsel bases its defense,—1. Upon the right of a natural person to protect his lands from overflow, upon the principle of self-defense, as held in *Rex* v. *Commissioners*, 8 Barn. & C. 355; and 2. Upon its right as a public municipal corporation organized under the laws of the state, exercising the police powers of the state, and acting as a public instrumentality of the state in providing for the public welfare and in complying with the conditions upon which the grant of swamp and overflowed lands was made to the state by the general government.

In *Rex* v. *Commissioners, supra,* the facts were these: The commissioners of the levels, for the purpose of protecting the property intrusted to their care against the inroads of the sea, erected certain groynes and other works, which caused the water to flow with greater force against the lands of one Cosens, and to injure them and to gradually wash a portion of them away. The lands of Cosens fronted on the seashore, and were adjoining and to the eastward of the levels on which the works of the commissioners were erected. The question was, whether or not the commissioners could be compelled to pay for the damages done to the lands of Cosens, or to erect other works to prevent further injury to said lands. The court decided that the commissioners were not liable, and that Cosens would have to protect his own lands by works similar to those of the commissioners. Lord Tenterden, C. J., in delivering the opinion of the court, said, among other things, as follows: "But the sea is a *common enemy* to all proprietors on that part of the coast, and I cannot see that the commissioners, acting for the common interest of several land-owners, are, as to this question, in a different situation from any *individual proprietor.* Now, is there any authority for saying that *any* proprietor of land exposed to the inroads of the sea may not endeavor to protect himself by

erecting a groyne or other reasonable defense, although it may render it necessary for the owner of the adjoining land to do the like? I certainly am not aware of any authority or principle--of law which can prevent him from so doing. . . . . I am therefore of opinion that the only safe rule to lay down is this: that *each* land-owner, *for himself*, or the commissioners acting for several land-owners, may direct such defenses for the land under their care as the necessity of the case requires, leaving the others, in like manner, to protect themselves against the common enemy." And Bayley, J., says: " I am entirely of the same opinion. It seems to me that every land-owner exposed to the inroads of the sea has the right to protect himself, and *is justified* in making and erecting such works as are necessary for that purpose. . . . . If a man sustains damage by the wrongful act of another, he is entitled to a remedy; but to give him that title two things must occur,—*damage* to himself, and a *wrong* committed by the other. That he has sustained damage is not of itself sufficient. Now here, Mr. Cosens may have sustained damage, but the commissioners have done no wrong. The *dictum* of Justice Wilmot was cited to show that when there is a right, this court ought to find a remedy. But the right that Mr. Cosens and each land-owner has is *to protect himself*, —not to be protected by his neighbors. To *that* right no injury has been done, nor can any wrongful act be charged against the commissioners."

Logically, this principle would seem to be applicable to the waters of large navigable American rivers subject to extensive overflows. And it has been thus made applicable in a number of adjudicated cases. (*Hoard* v. *City of Des Moines*, 62 Iowa, 326; *S. & B. Turnpike Co.* v. *Green*, 99 Ind. 205; *C. & V. R. R. Co.* v. *Stevens*, 73 Ind. 283; *Dubose* v. *Levee Commissioners*, 11 La. Ann. 165; *Bass* v. *State*, 34 La. Ann. 494.) But inquiry on this branch of the subject need not here be further prosecuted, be-

cause counsel for appellant have argued the case almost entirely upon the theory that respondent is a municipal corporation acting under the authority of the state; and that, therefore, although exercising the power of the state, it is bound, like the state, by the constitutional limitation that private property cannot be taken for public use without compensation." This view of the case rests upon the assumption that building the levee, and thereby subsequently causing the damage complained of, was done under the power of eminent domain; and that, therefore, appellant was entitled to compensation for the "taking" of his land. But assuming the theory to be correct, the position is clearly untenable. In the first place, when respondent built the levee, it could not possibly have condemned appellant's land under the power of eminent domain. It could not have shown that it had any use for said land, or intended to use it, or even to damage it, or to interfere with it in any way. And then the subsequent damage which happened years afterward was not a "taking" within the meaning of the most extreme cases on that subject. It was, in the extreme sense, indirect, remote, and consequential. There was no physical directness between the act and the damage. It cannot be claimed that the water which the levee prevented from going over and through the west bank of the river was the *very water* which afterwards flowed on to appellant's land. It was remote and indirect in point of place and distance; it took place two miles away, and on the opposite side of a large, navigable river. It was indirect, remote, and consequential in point of time; it took place more than seven years after the act complained of. And there was nothing in the nature of a permanent use or occupation of the land; it was a mere temporary overflow, which occurred once in seven years, and it is impossible to know when, if ever, it will occur again, or with how small an effort appellant could make its recurrence improbable or impossible. It

is therefore one of the plainest cases for the application of the well-established rule that the state is not liable for remote and consequential damages caused by the erection of public works. That rule has been held to go much farther than it is necessary to extend it here in the cases of *Green* v. *Swift,* 47 Cal. 536, and *Green* v. *State, ante,* p. 29, which two cases are, we think, determinative of the case at bar in favor of respondent.

Under these views, it is unnecessary to discuss the distinction made by counsel for respondent between " eminent domain " and the " police powers " of a state. The right and duty of the state — acting for the public benefit and the general welfare, and by means of municipal corporations like respondent — to reclaim the swamps and overflowed land granted to it by the Arkansas act, we do not understand to be disputed. (*Kimball* v. *Reclamation Fund Com'rs,* 45 Cal. 344; *Hagar* v. *Yolo County,* 47 Cal. 222; *People* v. *Reclamation Dist. 108,* 53 Cal. 346; *Dean* v. *Davis,* 51 Cal. 406.) And counsel for respondent argues that this right is exercised under the police powers of the state, and that therefore appellant would not have been entitled to compensation even if his property had been " taken." But as the land of appellant was not taken, we need not follow the point here made by respondent. Under either view, respondent is not liable for the remote and indirect damage.

With respect to the matters involved in this case, it may be remarked that the Sacramento very closely resembles the Mississippi River, the difference being in magnitude, not in character. And it has been held in states bordering on that river that the state may not only control and levee its banks for the purpose of preventing the adjoining country from overflow, but may compel riparian owners to maintain such levees at their own expense. (*New Orleans Drainage Co.'s Case,* 11 La. Ann. 370; *Bass* v. *State,* 34 La. Ann. 494; *Dubose* v. *Levee Com'rs,* 11 La. Ann. 165.) And it is a matter of com-

mon knowledge that since the settlement of California by Americans it has been the custom of cities, towns, and private riparian owners along the Sacramento River to protect their lands from overflow by building levees on its banks. If the works of respondent can be declared a nuisance, then the levees in front of the cities of Colusa and Sacramento, which preserve millions' worth of property, including the capitol buildings and grounds of the state, can be removed at the suit of any owner who will not protect himself, and who can show that the swell of the river is increased in times of flood by levees either above or below him, and the whole system of reclamation can be defeated.

Counsel for appellant contends that Wilkins Slough is within the legal definition of a " watercourse," and argues for the application here of the doctrine that one landowner on a watercourse cannot dam it so as to flood the land of his neighbor above. But in the first place, appellant is not a riparian owner upon Wilkins Slough. His land is two miles away, and divided from it by a large navigable river. He has no interest in whatever rights land-owners on Wilkins Slough, if there were any, might have as between themselves. In the second place, we do not think that Wilkins Slough, as between appellant and respondent at least, is to be treated as a watercourse within the legal meaning of that word. It occasionally happens that a river, in its course from its source to its mouth, divides into two main, permanent channels, each carrying continuously a large part, if not a moiety, of its waters at all stages, and either uniting with the other at a lower point, or continuing to the sea, leaving a delta between the two. But there is nothing here resembling that condition. Wilkins Slough is not a channel or fork, continuously carrying a large part, or any part, of the waters of the Sacramento River. It carries no water at all except " in times of flood," and then the amount which it carries, when compared with

the volume of water in the river, is insignificant. In fact, it has no original water of its own at all, but is simply a conduit by which occasionally some of the flood-water of the river escapes into the lower lands adjoining. This same office is performed by every other low place along the bank; and every other part of the levee could be removed as a nuisance if that part of it which is at Wilkins Slough can be so removed. Upon this point we cannot distinguish the case at bar from the case of *S. & B. Turnpike Co.* v. *Green*, 99 Ind. 205, where it was held that plaintiff could protect his land from overflow of the Big Blue River by erecting a levee on its bank at a place where there was "a *depression* washed out across the lands of plaintiff," and where, "when there was a rise in said river, the water passed out over said lands of plaintiff," although it caused a greater overflow on the premises of defendant, to its damage.

Considering, therefore, all the facts and circumstances of this case, and confining our opinion to the case here made, we think that the works of respondent complained of by appellant do not constitute a nuisance, and that respondent is not legally liable for the incidental damage caused thereby, as above described.

Judgment affirmed.

SEARLS, C. J., concurred.

TEMPLE, J., concurring.—I concur in the judgment and in the opinion, but I do not agree to the construction apparently placed upon the case of *Green* v. *Swift*, 47 Cal. 536, and upon the case of *Green* v. *State, ante*, p. 29.

PATERSON, J., concurring.—I concur in the judgment on the ground that the character, size, and operation of the slough which was obstructed cannot be satisfactorily determined from the pleadings upon which the cause was submitted and decided. Before a court of equity would be authorized in declaring the levees and dams

of a reclamation district to be nuisances, and ordering them abated as such, something more should be shown than that the slough obstructed does at all times, when unobstructed, " divide the waters of the river *in times of flood,* and carry and conduct large volumes thereof to the southwestward, away from the lands of plaintiff *to a natural basin.*"

It is true, the complaint alleges that said slough was a natural watercourse, but other allegations of the complaint and answer (which must be taken as true) leave that matter very doubtful and unsatisfactory.

The state and its grantees are charged with a great trust with respect to swamp and overflowed lands under the laws by which they are granted, and it is by no means clear that that trust can be executed if we apply strictly the common-law rules applicable to nuisances caused by the obstruction of natural watercourses. It may be necessary, under our peculiar conditions as to seasons, watersheds, river systems, and swamp-lands, to find a new definition for the term "natural watercourse," if we are to apply old principles to the innumerable sloughs which are found in our overflowed districts, and which have well-defined banks and beds. There are channels in this state not well defined in bank and bed, without water in them during certain months of the year, yet so important in operation during high water that to dam them would be disastrous to life and property; and there are sloughs running out from the rivers in the low-lands with well-defined banks and beds, and with water running bank-full every month in the year, yet so unimportant in their operation that to close them would have no appreciable effect upon the river or its tributaries, except to improve the same for navigation, but so numerous in the overflowed districts that to restrain the obstruction of them simply because they are within the accepted definition of a natural watercourse would in many instances prevent the reclamation of

large and valuable tracts of land which the state and its grantees have undertaken, and are in duty bound to reclaim. The dam and levee complained of were constructed in 1872, and have ever since been maintained. This action was commenced January 20, 1883, to procure an abatement of the levee and dam, and recover the sum of five thousand dollars damages alleged to have been caused by the destruction of plaintiff's growing crops, fences, and other improvements, and it does not appear that any complaint was made prior to the last-named date.

If the slough is one which, considering the end to be accomplished by defendant, and with due regard to the property rights of others, could not lawfully be obstructed, it may be fairly inferred that plaintiff would have discovered the fact, and proceeded to have the obstruction abated long before the commencement of this action. The delay in bringing the suit adds to the uncertainty arising from the complaint and answer concerning the equity of plaintiff's prayer for the abatement of the levee and dam as a nuisance.