[L. A. No. 6045. Department One.—December 6, 1920.]

## J. M. HORTON et al., Respondents, v. EDGAR D. GOODENOUGH et al., Appellants.

[1] WATERS AND WATER RIGHTS—SURFACE WATERS—OBSTRUCTION OF FLOW—RIGHT OF LAND OWNER.—One has no right to obstruct the flow on to his land of what are technically known as surface waters, but by surface waters are not meant any waters which may be on or moving across the surface of the land without being collected into a natural watercourse, but only waters falling on the land by precipitation or arising thereon in springs.

[2] ID.—FLOOD WATERS—RIGHT OF OBSTRUCTION.—One has the right to protect himself against flood waters, that is, waters escaping from a natural watercourse, and for that purpose to obstruct their flow on to his land, even though such obstruction causes the water to flow on to the land of another.

[3] ID.—NATURAL WATERCOURSE — OBSTRUCTION.—One may not obstruct or divert the flow of a natural watercourse, that is, a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow, but not meaning the gathering of errant water while passing through a low depression, swale, or gully.

[4] ID.—ESCAPING WATERS OF STREAM — NATURE OF — PROTECTION AGAINST BY PROPERTY OWNERS.—Where, at a time of extreme

high water, some of the water of a canyon on emerging from it broke out of its channel and flowed down the opposite side of the cone of detritus from that which it had previously flowed, such water was flood water running wild, and property owners threatened thereby had the right to protect themselves against it as best they could, it being immaterial that the water had made for itself a channel or followed some natural channel, gully, or depression and had come to the properties as a stream instead of spreading out over the ground.

[5] ID. — ACTION FOR DAMAGES — ESTOPPEL BY FORMER JUDGMENT — INSUFFICIENCY OF PLEADING.—In an action to enjoin the diversion of flood waters, the court properly refused leave to file a supplemental answer pleading a judgment against the plaintiff in another action brought by him against the defendant, where there was no allegation that the issue in question was in fact determined by the judgment adversely to the plaintiff, or any equivalent allegation showing an estoppel.

[6] JUDGMENT—ESTOPPEL.—If the issue as to which estoppel by former judgment is claimed is one which had to be determined by the jury in order to arrive at their verdict, the verdict and consequent judgment are a final determination of the issue binding upon the parties in all subsequent litigation, but if the issue were not the one which the jury had to decide to arrive at their verdict, there is no estoppel with regard to it.

APPEAL from a judgment of the Superior Court of Ventura County. Merle J. Rogers, Judge. Reversed.

The facts are stated in the opinion of the court.

Robert M. Clarke for Appellants.

Charles F. Blackstock for Respondents.

OLNEY, J.—This is an action wherein the plaintiffs seek to enjoin the continued maintenance by the defendants of certain small structures which the latter have built for the purpose of preventing water from flowing on to their lands. There is no question but that the defendants built the structures complained of or that the structures, or one of them, had the effect of diverting the water from the course it otherwise would have followed into a course which finally led some of it to the plaintiffs' land. The only question is as to the right of the defendants to maintain the structures. The primary rules of law governing such a case are

simple enough and well settled, and are three in number.
[1] First, one has no right to obstruct the flow on to his
land of what are technically known as surface waters.
(*Heier* v. *Krull,* 160 Cal. 441, and authorities therein cited
at page 444, [117 Pac. 530].) But by surface waters are
not meant any waters which may be on or moving across
the surface of the land without being collected into a nat-
ural watercourse. They are confined to waters falling on
the land by precipitation or rising thereon in springs. Put-
ting it conversely, they do not include waters flowing out
of a natural watercourse, but which yet were once a part
of a stream and have escaped from it—flood waters, in other
words. (*McDaniels* v. *Cummings,* 83 Cal. 515, [8 L. R. A.
575, 23 Pac. 795]; Farnham on Waters, sec. 278.) [2]
Second, one has the right to protect himself against flood
waters, that is, waters of the character last described, and
for that purpose to obstruct their flow on to his land, and
this even though such obstruction causes the water to flow
on to the land of another. (*Barnes* v. *Marshall,* 68 Cal.
569, [10 Pac. 115]; *Lamb* v. *Reclamation District,* 73 Cal.
126, [2 Am. St. Rep. 775, 14 Pac. 625]; *De Baker* v. *South-
ern Pac. Ry. Co.,* 106 Cal. 257, [46 Am. St. Rep. 237, 39
Pac. 610]; *Sanguinetti* v. *Pock,* 136 Cal. 466, [89 Am. St.
Rep. 169, 69 Pac. 98].) [3] Third, one may not obstruct
or divert the flow of a natural watercourse. But by a
watercourse is not meant the gathering of errant water while
passing through a low depression, swale, or gully, but a
stream in the real sense, with a definite channel with bed
and banks, within which it flows at those times when the
streams of the region habitually flow. (*Los Angeles etc.
Assn.* v. *Los Angeles,* 103 Cal. 466, [37 Pac. 375]; *Sangui-
netti* v. *Pock, supra; San Gabriel Valley Country Club* v.
*Los Angeles County,* 182 Cal. 392, [9 A. L. R. 1200, 188
Pac. 554]; *Simmons* v. *Winters,* 21 Or. 35, [28 Am. St. Rep.
727, 27 Pac. 7].)

Such being the law, the complaint and findings are quite
uncertain as to the character of the waters whose diversion
by the defendants' obstructions is complained of. They are
alleged and found to be "surface or flood waters." But if
these words are used in their technical senses, surface waters
and flood waters are not the same, and the defendants have
not the right to obstruct them in the one case and have the

right in the other. Nor is the uncertainty removed by assuming that the words were not used in a strictly technical sense, but that what was meant was that the waters were errant waters flowing over the surface of the ground without being gathered into the channel of a watercourse. If that be the meaning, then the character of the waters as surface or flood waters in the technical sense is not stated, and yet, according as they are one or the other, the plaintiffs are or are not entitled to recover. Nor is this uncertainty cured by the further statement in the complaint and findings that the obstructions were of waters "in natural channels." It is quite evident from the context that the channels so spoken of were channels only for flood and surface waters, and were not the channels for watercourses or streams in the real sense. Apparently the cause was tried and decided upon the theory that the defendants had no right in any case to obstruct the flow of water on to their lands. Such is not the law. If the water was flood water, the defendants had the right to divert it from their lands even though such diversion injured the plaintiffs. It may, perhaps, be that even in such a case the defendants could not divert the water in a manner which would unnecessarily injure the plaintiffs, but that question is not presented and does not require consideration.

But we need not decide the case upon any insufficiency of the complaint and findings. The evidence, while perhaps somewhat obscure on certain points, is without substantial conflict and we believe the material facts appear with reasonable certainty. The water whose diversion is complained of came from a canyon known as Jepson Canyon, which opens off the west side of the Sespe Valley, in Ventura County. This valley extends north and south, draining to the south, and the lands of all the parties are within it. Through approximately the middle of the valley runs the county road, which is its main highway. The lands of the defendants Hiller and Birss lie side by side on the west side of this road, and fronting upon it, that of Hiller being the more northerly of the two tracts. At their rear or westerly ends these tracts are almost immediately against the mouth of the Jepson Canyon. Directly to the east and across the main road from them lies the land of the defendant Goodenough. It fronts on the road at its westerly end,

and extends easterly to the Arroyo Sespe, or Sespe Creek, which flows to the south. approximately parallel with the county road and drains the valley. The land of the plaintiffs is some distance to the south from Goodenough's land, and, like it, lies on the east of the county road, fronting upon it and extending from it to the Arroyo Sespe. The plaintiff Turner holds the legal title to the land, while the plaintiff Horton is the equitable owner. For the purposes of discussion we may treat them as a single plaintiff.

In January, of 1914, at a time of extreme high water, some of the water of Jepson Canyon on emerging from it took a course which it had not previously followed, at least not since the region was settled up, and came in a stream against the west fence of Hiller's land near its southwest corner. There it turned southerly along the fence to the northerly end of Birss' west fence, and continued southerly along the latter. When it approached the southwest corner of Birss' land, it cut across it to the east and followed easterly along his south line to the main county road. It then flowed across this road and against the land of Goodenough at its southwest corner. It there went through or over his fence and followed along his southerly line until it lost itself in the Arroyo Sespe. In the years following the first invasion of the lands of the defendants in this manner, some of the water from the canyon continued to escape in similar fashion in times of high water and to follow the same course, and each of the defendants endeavored to protect his land against it. The obstructions erected for that purpose are those which the plaintiff seeks to have abated in this action. Those of Hiller and Birss were to keep the water outside their west fence instead of permitting it to come through and flow along the fence on the inside, and did not otherwise change the course of the stream. After reaching the south end of Birss' fence, it turned east as before, along his south line and came to the main county road, which it crossed to Goodenough's land. Goodenough's obstruction was to prevent the water coming through his fence at this point, and it had the effect of changing the course of the stream and turning the water south along the county road, where it distributed itself upon Goodenough's neighbors, including the plaintiff.

Upon the foregoing facts we are unable to see upon what possible theory it can be said that the plaintiff is injured by

the obstructions of Hiller and Birss; and, unless he is injured, he has no cause of action against them, regardless of whether they had the legal right to maintain the obstructions or not. Their obstructions, as we have in effect said, did not in the slightest change the point at which the water reached the county road, crossed it, and ran against the fence of Goodenough. It was the latter's obstruction alone that turned the water south along the county road so that it finally came to the plaintiff. This is sufficient for a disposition of the case as to Hiller and Birss. This conclusion is possibly not true as to Hiller. There is a hint in the evidence—it is hardly more than that—that before Hiller put in her obstruction, the water when it came through her fence, instead of following along it to the south, as the plaintiff himself testifies, went northeasterly across her land to the channel of the main stream from the canyon. If this were the fact, then her obstruction did have the effect of turning the water south so that it finally reached the plaintiff's land when otherwise it would not have done so, and her position is the same as that of Goodenough. As to Birss, however, we have been unable to find even a hint in the evidence that his obstruction had any such effect.

The situation as to Goodenough is, of course, different. His obstruction undoubtedly had the direct effect of turning the course of the water so as to make it come to and upon the plaintiff's land. Before discussing the situation so presented, we cannot, however, avoid the observation that if the neighboring land owners about the mouth of Jepson Canyon, all of whom are threatened by flood waters from it, had done the only rational thing of uniting upon some plan to take care of those waters, instead of litigating about their respective rights when the waters are upon them, the cost in all probability would have been less than the final expense of this litigation to either side; and in the meantime presumably the waters are still not taken care of. But the parties have not seen fit to do this, and it is necessary to determine just what their legal rights are.

The physical situation at the mouth of Jepson Canyon is a not uncommon one in this state. At the mouth of the canyon there is a cone of detritus washed down the canyon during the centuries, with its apex in the canyon and extending out fan-like over the valley lands. In all proba-

bility, the stream on coming to the cone has in times past shifted from one side to the other of it as the channel has from time to time filled up or been obstructed. It is probably apt again to shift its channel in the same manner unless prevented by artificial means. But at the present time, and for many years now, the channel of the stream has been on the northeasterly slope of the cone, coming down to the northerly portion of Hiller's land and thence across it and the northerly portion of Goodenough's land to the Arroyo Sespe. For years prior to 1914 no water, even in times of high water, broke out of this channel to flow down the southeast slope of the cone. In the extreme high water of January of that year, however, some of the water of the stream did break out and flow to the southeast, and it is this water which came to Hiller's land at its southwest corner and ultimately caused this litigation. In breaking out it evidently made something of a channel, so that since that time some water has taken the same course in times of high water, even though the water was not as high as in 1914 when the break was first made. The legal question presented is, Has a land owner below such a break the right to protect his land against the water coming through it, even though his doing so has the effect of causing the water to seek an outlet over the land of a neighbor?

[4] To this question we can see but one answer, and that is that he has such right. The waters are plainly flood waters breaking out of their channel and running wild, and as such each property owner threatened has the right to protect himself against them as best he can, under the authority of the decisions we have already cited, the most notable of which is *Lamb* v. *Reclamation District,* 73 Cal. 126, [2 Am. St. Rep. 775, 14 Pac. 625]. The waters are not surface waters in the technical sense, for they have already been gathered into a stream whence they have escaped.

The plaintiff relies upon the authority of *Ventura etc. Co.* v. *Meiners,* 136 Cal. 284, [89 Am. St. Rep. 128, 68 Pac. 818], but we are unable to see its applicability. The final question there involved was as to whether one of the parties was or was not a riparian owner, and this in turn depended on whether the banks of the stream were those of its channel in times of usual flow or were the high banks farther back, which

included between them river bottom land over which the stream habitually flowed in high water but not at other times. It was held that the latter were the true banks. Now, it may well be that the floor of Jepson Canyon is of the same character, that is, bottom land over which the stream flows in high water with a smaller channel or channels in it to which the stream is confined at other times. But the question here is not as to what were the banks of the stream in Jepson Canyon, but did the water whose course the defendant diverted escape from that stream on its emerging from the canyon, no matter what its banks were. That the water was from the stream seems to be assumed by both sides without question and is plainly shown by the plat introduced in evidence on behalf of the plaintiff. That it escaped from the stream would seem to be perfectly plain from the fact that it left the main body of the stream and took a course which it had not previously followed.

Nor is the fact material that the waters have made for themselves a channel or follow some natural channel, gully, or depression, and now come to the defendants' lands as a stream instead of spreading out over the ground. The waters do not come as the stream of a natural watercourse following its accustomed channel, but as a stream which has escaped from such a channel and is following a new and unaccustomed course. The fact that in their course they make a channel or perhaps follow some natural runway made by surface waters does not change their character or give to the course which they follow the character of a natural watercourse. A natural watercourse is, as we have said, only the course of a permanent stream, that is, permanent in the sense that it habitually flows when the streams of the region are accustomed to flow and not merely in times of storm when surface water is running off.

The case, it seems to us, is plainly controlled by the authorities we have mentioned. But even if it were one of first impression, we do not see how any other rule could reasonably be adopted in such a situation as that presented at the mouth of Jepson Canyon. There is, and has been for years, a definite channel for the stream emerging from the canyon and crossing the valley to the arroyo. The lands about the mouth of the canyon have been settled and improved upon the assumption that the stream would continue

to follow this channel. The channel being there, it is to the interest of everyone that it should remain there, with the possible exception of the land owners through whose lands it runs. They, perhaps, might be·benefited by the shifting of the stream, but their lands are subject to the legal burden of the channel as it is, and there is no reason why this burden should be shifted to lands of others. The other land owners have the legal right to have the stream continue in this channel, and could object to its diversion to another course by artificial means. It is, however, possible that it may be diverted by natural means. The danger of this happening is one common to all the lands immediately below, and if the threat becomes a reality and the stream or a part of it does shift, it would be both unjust and unpractical not to permit the particular land owner whose property is invaded to protect himself as best he may. There is no reason why he should bear the entire burden of what is a common danger. Every reason which induced the adoption of the rule as to flood waters in the first instance applies here. Any other rule would be a hindrance and not a help to settlement and improvement. In particular, there would be little inducement for any united effort to keep the stream where it both properly and legally belongs, and yet such effort is the only practical means of ending or minimizing the common danger. Our conclusion, therefore, is that upon both authority and reason the defendants had the right to protect themselves against the water in question, and that the judgment against them is without support.

[5] Since a new trial is necessary, there is a further point which should be determined. At the trial, the defendant Goodenough asked leave to file a supplemental answer pleading a judgment against the plaintiff in another action brought by him against Goodenough. The court refused leave to file the answer, and this ruling is complained of. The ruling was correct. The answer was wholly insufficient to show any estoppel of the plaintiff. It alleges merely that the complaint in the first action alleged that the defendant therein had obstructed natural water channels and had thereby caused water to flow upon and across the plaintiff's land, that the defendant had answered denying this allegation, that the action had been tried and evidence pre-

sented upon the issue so made, and that judgment had been given that the plaintiff take nothing by his action. But it does not follow that merely because the issue was made and judgment then had (and this, in effect, is all that is alleged), the issue was determined by the judgment. The judgment may have been based upon other issues entirely, for example, upon issues raised by some plea in abatement. It is not even alleged what the action was for. It may have been that the diversion alleged and as to which issue was made was not the gravamen of the plaintiff's supposed cause of action, and that the issue was really not material, and that the action was determined without regard to it. In the absence of an allegation that the issue was in fact determined by the judgment adversely to the plaintiff, or some equivalent allegation, the answer did not show any estoppel upon the plaintiff.

We learn from the briefs that the action was in fact one for damages alleged to have been sustained by the plaintiff by reason of the defendant's diversion, that a jury trial was had and a general verdict returned in favor of the defendant, and that upon this verdict judgment was entered. Inasmuch as the defendant may offer a more complete pleading before a new trial is had, and the question is discussed as if these further facts were before us, it may be well to discuss them now. The case, then, is one of a judgment given upon a general verdict. The rule in regard to it is a simple one. [6] If the issue, as to which estoppel is claimed, is one which had to be determined by the jury in order to arrive at the verdict they reached, the verdict and consequent judgment are a final determination of the issue binding upon the parties in all subsequent litigation. On the other hand, if the issue were not one which the jury had to decide to arrive at their verdict, as, for example, if in the other action there were other issues presented by the defendant's answer which made out a good defense even though this particular issue were determined favorably to the plaintiff's contention, then it is not possible to say that this issue has in fact been determined one way or the other, and there is no estoppel with regard to it. The pleadings are not before us and we do not know just what the issues were, but presumably the defendant denied any injury to the plaintiff by the diversion, and if he did, the jury, as

plaintiff's counsel well say, may have reached their verdict upon that issue alone. The following statement from *Russell* v. *Place,* 94 U. S. 606, 608, [24 L. Ed. 214, see, also, Rose's U. S. Notes], covers the case exactly: "It is undoubtedly settled law that a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties. But to this operation of the judgment it must appear, either upon the face of the record or be shown by extrinsic evidence, that the precise question was raised and determined in the former suit. If there be any uncertainty on this head in the record,—as, for example, if it appear that several distinct matters may have been litigated, upon one or more of which the judgment may have passed, without indicating which of them was thus litigated, and upon which the judgment was rendered,—the whole subject matter of the action will be at large, and open to a new contention, unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined." (See, also, 1 Freeman on Judgments, secs. 276, 276a; 23 Cyc. 1536; 15 R. C. L. 980.) We should, perhaps, in this connection call attention to the distinction between a judgment operating by way of estoppel in a later action upon a different cause of action and one operating by way of bar against a second action upon the same cause of action. If in this case the other action had been upon the same cause of action as the present, that is, had been an action to abate the defendant's obstructions, a judgment for the defendant upon the merits would have been a bar to a second action for the same purpose, regardless of what different or various issues may or may not have been presented. But, as we are given to understand, the other action was not the same as the present. The judgment in it can, therefore, not operate as a bar to the present action, but at most only as a judicial determination binding upon the parties of issues again involved between them. In order that it may so operate, it must of necessity appear that it did in fact determine those issues. This, of course, we cannot determine, as the judgment-roll is not before us.

Judgment reversed.

Shaw, J., and Lawlor, J., concurred.