[Civ. No. 2998.   Fourth Dist.   Nov. 22, 1943.]

PEARL M. McMANUS, Appellant, v. H. W. OTIS et al.,
Respondents.

Hill, Morgan & Bledsoe, Vincent Morgan and William A. Wood for Appellant.

Evans & Boyle and Sarau & Thompson for Respondents.

GRIFFIN, J.—The appeal is by plaintiff and appellant Pearl M. McManus from a judgment in favor of the defendants and respondents H. W. Otis and Smoke Tree Properties, Inc., a corporation, alias Mardo Corporation.

The action is one for injunction and to recover damages for injuries to real property alleged in the complaint to have been sustained as a result of the construction by defendants of two parallel dykes whereby the "rain and storm waters" flowing out of Palm Canyon and over the alluvial cone thereof were in 1937 and 1938 collected and concentrated into a narrow channel and so diverted from their natural course as to damage plaintiff's land. The original complaint recites a cause of action based upon damage alleged to have occurred in February, 1937, and the supplemental complaint recites a cause of action based upon injuries alleged to have occurred to the land in March, 1938.

Palm Canyon, situate in Riverside County, lies between a range of mountains known as the San Jacinto Mountains on the west, and another range known as the Murray Mountains on the east. The waters from this canyon during periods of heavy rainfall and melting snow have their watershed in Palm Canyon, which watershed comprises approximately 94 square miles. Two other tributary watersheds known as the Murray Canyon and the Andreas Canyon watersheds have a watershed area of 17.3 square miles. These waters were accustomed to flow northerly through and out of Palm Canyon onto its alluvial cone or fan which extends from the mouth of Palm Canyon to a point where that cone is intercepted by the Tahquitz flood plane. The main channel in which the waters flow is along the foot of the Murray Mountains until they reach the state highway at a place known as Araby Point, where they flow generally northeasterly and easterly across section 30 and across appellant's land in section 29, township 4, south range 5 east, S. B. B. & M., hereinafter referred

to as section 29. The main Palm Canyon cone was crossed by a paved highway extending in an easterly direction from a point south of the town of Palm Springs to the town of Indio, and which was designated throughout the testimony as the "state highway." This highway, at the times of the two floods here involved, crossed the fan or cone of Palm Canyon at roughly a right angle, passing by the northerly end of Murray Mountains at Araby Point, thence following an easterly and southerly course toward Indio. In doing so it traversed a portion of the southerly half of section 29. The west line of this section lies approximately one mile east of Araby Point. It was stipulated that it was only the property in the south half of section 29 which plaintiff claims was damaged by the action of the defendants. From Araby Point the mountains turn abruptly and follow a general easterly and southeasterly direction forming the southerly boundary of the Coachella Valley, and are known as the Santa Rosa Mountains. The San Jacinto Mountains, which form the west boundary of Palm Canyon and the Palm Canyon alluvial fan or cone, continue on in a northerly direction for a distance of several miles. At their easterly base to the north of the cone and north of the flood plane of Tahquitz lies the town of Palm Springs, approximately a mile or more north from where the alluvial fan or cone is crossed by the state highway. From Palm Springs the Tahquitz River, having its origin in the San Jacinto Mountains, flows across the Coachella Valley in an easterly and southeasterly direction and across portions of section 29, the property of plaintiff. Whitewater River flows north of the city of Palm Springs and in a southeasterly direction to where it joins with Tahquitz River at a point south and east of section 29, and continues on past Cathedral City to the general vicinity of Indio. Palm Canyon River is dry except during and immediately after the rainy season.

The Palm Canyon alluvial fan has a definite sweep and extent until it is interrupted by another topographical feature, namely, the Tahquitz flood plane. Northerly of Tahquitz flood plane there exists the Whitewater River system and the Whitewater alluvial fan below what is known as Whitewater Point. The channel of the Whitewater River system passes below what is known as Windy Point or Whitewater Point. The Palm Canyon alluvial fan comes in from the south and meets the alluvial fan of the Whitewater stream

system, and confines the Tahquitz flood plane to a comparatively narrow belt between the two, the sand hills to the north of the flood plane representing the sweep of the Whitewater cone or fan, and the southern bank of the Tahquitz representing the extent of the Palm Canyon alluvial fan. Whitewater River starts easterly down the north side of Coachella Valley and then makes a sweep of about 45 degrees, crosses over its fan and joins the Palm Canyon stream system just below section 29 against the foot of the Santa Rosa Mountains. The junction is the lowest point in the drainage system of Whitewater, Palm Canyon River and Tahquitz River.

Palm Canyon Cone has a peculiarity not typical of most cones, i. e., its tilt. Instead of coming out and flowing at equal gradients from the apex, it has been tilted, governed by the grade of Tahquitz Creek which intercepts its northern extension. The tilt of the cone has resulted in a raising of the western portion or a dipping of the eastern portion, with the steepest gradient along the eastern margin of the cone, namely, along the line of the channel at the foot of the Murray Mountains.

In the vicinity of Smoke Tree Point, which juts out into the line of drainage of the main cone, is a subsidiary cone. The tilt of the major alluvial fan also governs this subsidiary cone, causing the flow on this cone to return in a northeasterly direction to what is described as the main channel. Another subsidiary cone occurs at Araby Point. This cone is similar to the cone at Smoke Tree Point, except that it has no support on the east by the mountains. The waters leaving the apex of Araby Point cone not only naturally continue northerly or northeasterly, but also swing around into a northeast and easterly direction, and even in a southeasterly direction. This is influenced by the tilt of the Palm Canyon cone, as well as the Tahquitz flood plane. There is a drop of 113 feet in elevation from a point known as Black Tent, which is located on the state highway on the Palm Canyon alluvial cone, approximately a mile west of what is known as the Smoke Tree Ranch, to the southwest corner of Cree's Date Garden, located in section 29.

A further factor of importance is the slope of the land from Tahquitz wash to the foot of Santa Rosa Mountains. There is an eight-foot drop to the south along the west line of section 29. At the north and south center line of section 29

there is approximately a twelve-foot drop from Tahquitz wash to a point in front of Cree's Date Gardens at the southwest corner thereof.

The land of defendant Smoke Tree Properties, Inc., and a portion of the land of defendant Otis lie on the Palm Canyon alluvial cone, hereinbefore referred to, south of the state highway, and these lands are adjacent to each other. The Otis lands are in the east half of section 25, township 4 south range 4 east S. B. B. & M., and the Smoke Tree property constitutes the west half of said section 25, which property is referred to as Smoke Tree Ranch.

Plaintiff has been the owner of section 29 for many years. In 1929 she appeared before the Coachella Valley Storm Water District Board of Trustees, at a meeting which was called to discuss the construction of a public dyke leading northeasterly from Araby Point. At that time she stated that she had been paying storm water taxes. She asked the trustees to appropriate money "to do some construction work at Araby Point for the purpose of protecting these lands, section 29" and lands northeasterly from that point from overflow waters of Palm Canyon wash. She stated that some of the waters of the 1927 flood had flowed over her land from Palm Canyon. A public dyke was subsequently constructed by the county of Riverside. Plaintiff contributed to its cost. The length of the public dyke, as originally designed, was 2,600 feet and was designed for the purpose of closing in two washes in the northwest corner of section 30. The dyke, as actually constructed, was 1,500 feet long. The south end of it was 21 feet north from the center line of the then proposed highway. At Araby Point, between the south end of the public dyke and the highway, as later constructed, a levee was built across the 21-foot gap. That gap was lower than the dyke for two or three years before the 1937 flood. The construction of the levee consisted of sand bank and wire fence, with iron pipe driven on the west side of it. The area between the pipe and wire and the top of the levee was filled with brush. The posts were in the ground 10 feet and protruded four feet above it. Wire was strung from those fence posts and each post was 7½ to 8 feet apart. The levee was 18 feet at the base, 6 feet on the top and was 4 to 4½ feet high. It was agreed that the levee was not constructed to meet a flood of the magnitude of 1927.

During the latter part of 1936 the defendants constructed

on sections 25 and 36 two dykes of earth, rock and wire. The most easterly of those dykes extended in a northeasterly direction along the base of Murray Mountains from a point known as Smoke Tree Point in a straight line to where it ended at the state highway at Araby Point, a distance of approximately one-half mile. The westerly dyke commenced a short distance south of the southwest corner of section 25 and extended northeasterly therefrom in a straight line to the state highway opposite Araby Point, a distance of approximately one mile. At all points where the two dykes paralleled each other, they were 170 feet apart. Those dykes were constructed of earth, brush and trees, together with a wire fence erected to aid in the retention of the materials comprising the dykes. The earth fill back of the wire fence was 12 feet wide at the bottom, 6 feet wide at the top, and 4 feet high, with the exception that commencing at a point 900 feet southwesterly from the center line of section 25, and extending northeasterly for a distance of 500 feet to a point 400 feet southwesterly from said center line, the earth fill back of the wire fence was 18 feet in width at the bottom, 9 feet wide at the top, and 6 feet high. This last-mentioned section was referred to in the testimony as the "Super Dyke." Some of the material for constructing those dykes was obtained by scraping the soil and clearing the same of the brush and trees from the area between the dykes. Additional trees and brush were obtained from other areas.

In 1937 a major flood occurred, overflowing and destroying major portions of the dykes constructed by defendants and also s ipping and practically destroying the public dyke erected in 1929. Portions of those waters turned easterly at Araby Point, washed across and damaged the southwesterly porti ns of plaintiff's land in section 29. The flood peaks at Palm inyon, taken at the U.S.G.S. Station shows a flow in 1927 ( 9,400 second feet. There was a greatly reduced flow for the following years until 1937, when there was a flood peak flow of approximately 4,000 second feet. In 1938 the flood peak was approximately 2,250 second feet. Among the many exhibits received in evidence and considered by the court will be found a picture (Exhibit 49). It was taken of the flooded area a few hours before the peak flow of 1937. A stalled truck was on the highway at Araby Point where the water crossed the state highway. The water at that point practically submerged the truck in its entirety. The water

appeared to be of an estimated depth of 6 to 8 feet at that time. The estimated width of the main channel at that point is greatly in dispute. From defendants' evidence it appears that that distance ranged from 100 feet to 200 feet, and that any waters which extended beyond that were overflow flood waters which escaped from the main channel.

Plaintiff contends that in previous years several channels crossed the state highway as far north as the Smoke Tree Ranch and that in 1937 the main flow of water crossed the state highway between the dykes erected by defendants. The evidence in reference to this contention will be hereinafter discussed.

The trial judge, during the course of the trial, accompanied by an expert witness for each party, visited the scene. They pointed out to the judge the facts in dispute, the general contour of the alluvial cone, the existing banks of the main channel, the remains of the several dykes, and such other facts as were essential to a proper determination of the issues presented.

The main points now involved in this case on appeal are (1) Did the defendants have a right to build and maintain their dykes at the place and in the manner in which the same were constructed and maintained? (2) Did the construction and maintenance of the dykes cause the damage to plaintiff's land, i. e., is there any causal connection between the acts of the defendants and the damage, if any, done to plaintiff's land? The lower court found in favor of the defendants on both of the above issues. In addition, the court found that the waters which escaped from Palm Canyon River were overflow waters, i. e., flood waters against which the defendants had the right to protect themselves.

Appellant challenges the correctness of those findings and asserts that the uncontradicted evidence shows that the waters flowing out from Palm Canyon and to and over the alluvial cone thereof were seasonal storm waters arising from rainfall and melting snow in the mountains to the south thereof; that they flowed from the alluvial cone in washes and spread over a wide area on their way to Tahquitz River, none of which were well defined channels with beds and banks; that no main river course existed with a defined bed or bank out of which or through which "flood waters," as defined by our courts, could have overflowed or broken out so as to justify defendants in the construction of the dykes; that the dykes

brought about the collection and concentration of those waters in a narrow, artificial channel, discharging them at one point where, as a necessary consequence, they flowed to and across plaintiff's lands.

Plaintiff has cited many cases which establish the principle of law that in a case of surface waters having no defined channels, an upper appropriator cannot gather and concentrate surface water from a large area in a single channel and precipitate it in volume upon the servient tenement. (*Everett* v. *Davis,* 18 Cal.2d 389 [115 P.2d 821]; *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]; *LeBrun* v. *Richards,* 210 Cal. 308 [291 P. 825, 72 A.L.R. 336]; *Sanguinetti* v. *Pock,* 136 Cal. 466 [69 P. 98, 89 Am.St.Rep. 169]; *Rudel* v. *County of Los Angeles,* 118 Cal. 281 [50 P. 400]; *Humphreys* v. *Moulton,* 1 Cal.App. 257 [81 P. 1085].)

Defendants recite that "there is no disagreement between the parties in this case concerning the legal principles involved," and cites *Barnes* v. *Marshall,* 68 Cal. 569 [10 P. 115], where it was held that in case of *storm waters,* a property owner has the right to protect his land from the threatened change in the channel of an adjoining stream by erecting along the border a bulkhead as high as the original bank of the stream. Since this early decision, more important cases decided by our California courts on this subject are *Lamb* v. *Reclamation District No. 108,* 73 Cal. 125 [14 P. 625, 2 Am.St.Rep. 775]; *McDaniel* v. *Cummings,* 83 Cal. 515 23 P. 795, 8 L.R.A. 575]; *Jones* v. *California Development Co.,* 173 Cal. 565 [160 P. 823, L.R.A. 1917C 1021]; *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 P. 1024]; *Horton* v *Goodenough,* 184 Cal. 451 [194 P. 34]; *Weinberg Co.* v. *B⟨ ⟩y,* 185 Cal. 87 [196 P. 25]; and the more recent decisions ℓ *Mogle* v. *Moore,* 16 Cal.2d 1 [104 P.2d 785]; *Everett* Davis, *supra;* and *Archer* v. *City of Los Angeles,* 19 Cal.⟨⟩ 19 [119 P.2d 1].

In *Horton* v. *Goodenough, supra,* at page 453, the court stated:

"First, one has no right to obstruct the flow on to his land of what are technically known as surface waters. [Citing cases.] But by surface waters are not meant any waters which may be on or moving across the surface of the land without being collected into a natural watercourse. They are confined to waters falling on the land by precipitation

or rising thereon in springs. Putting it conversely, they do not include waters flowing out of a natural watercourse, but which yet were once a part of a stream and have escaped from it—flood waters, in other words. [Citing cases.] Second, one has the right to protect himself against flood waters, that is, waters of the character last described, and for that purpose to obstruct their flow on to his land, and this even though such obstruction causes the water to flow on to the land of another. [Citing cases.] Third, one may not obstruct or divert the flow of a natural watercourse. But by a watercourse is not meant the gathering of errant water while passing through a low depression, swale, or gully, but a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow. [Citing cases.]''

These general rules have been followed in subsequent cases and the courts have in practically all cases defined the general character of waters from which a property owner might or might not protect himself. Illustrative of this is the case of *Mogle* v. *Moore, supra,* which quotes from 26 California Jurisprudence, page 280, section 493, defining flood waters, as follows:

''Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term 'flood waters' is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse.''

It has been further held in this state that the liability of one who installs, maintains, or operates structures to protect his property against flood waters, depends on whether the acts of the owner of such structures were reasonable under the circumstances. (*Wade* v. *Thorsen,* 5 Cal.App.2d 706, 709 [43 P.2d 592].)

From the above it is apparent that in view of the different rules applicable to the cases of flood and surface waters, we must now review the testimony to determine whether or not there is sufficient evidence to support the court's finding that

the waters here involved were flood waters against which the defendants were entitled to protect themselves.

As to the nature of those waters, the evidence shows that plaintiff's expert witness, Mr. Hall, after duly qualifying himself as such, and stating his reasons for his opinion, in speaking of the Palm Canyon River, gave as his opinion that the "principal amount of water flowed down close to the hills (Murray Mountains) and smaller quantities have left this (channel) and wandered across the (alluvial) fan to the west, in temporary channels,—'' which changed from time to time.

Mr. Rowe, a duly qualified expert witness for defendants, who also testified as a lay witness, described conditions as they existed in the Palm Canyon River commencing with the year 1920. In that year he saw that water had flowed past Araby Point, but could not give the exact width of the flow. He did not see any area, either north or south of the highway, on which water had flowed west of the wash at Araby Point. In the 1921-1922 season he stated that the main body of water hugged Araby Point; that in 1926 the water again hugged Araby Point, and south of the highway was confined to an area now bounded by the dykes, or possibly the eastern boundary was a little more to the east than the easterly dyke; that on April 5, 1926, after the peak of the 1926 storm, there had been no flow of water across the highway west of the flow at Araby Point, except at the northwest corner of section 25. In 1927, he stated the active channel was right at Araby Point, i. e., the channel was right along the line where the dykes were later constructed, or possibly extended more to the east. Photographs in evidence support that statement.

The above-mentioned testimony generally concerns the area at Araby Point. Mr. Rowe's testimony with regard to conditions as they existed at the southerly end of the defendant's westerly dyke is that there was a channel which apparently came into the southerly end of the westerly dyke at an angle; that he measured the maximum flow of that channel and found it to be 80 second feet; that another small channel joined the above-mentioned channel at the south end of the dyke and came in from the southwest. He stated it to be his opinion that that channel was "an overflow channel from the main channel.'' On the west side of the channel above Lone Ranch Point, there existed a 7-foot bank. Between it and Lone Ranch Point flow the combined waters of Palm Canyon, Mur-

ray Canyon and Andreas Canyon. The width of the wash at that point in 1936 before the 1937 storm was 170 feet. After the 1937 storm it was 340 feet wide and the 1938 storm widened it to 382 feet. Mr. Rowe identified a westerly bank from Smoke Tree Point south to Lone Ranch Point, which existed prior to the 1937 flood. The easterly bank lies along the foot of the Murray Mountains through that area. He also testified that there was a continuous westerly bank along that course 18 inches to 4 feet high and that another channel leading from the main channel at Smoke Tree Point was an overflow channel because it had to flow over that bank, and that in 1927 the active channel of Palm Canyon River was right along the lines where the dyke was later constructed; that the dykes did not interfere with the natural flow of the waters at Smoke Tree Point, but did prevent overflow.

Other testimony of importance bearing upon that general subject was the testimony of the witness Rowe with respect to the gradients along the Palm Canyon alluvial cone. He showed that the steepest gradients were along the foot of the Murray Mountains. He illustrated his discussion with a model which was explained in his testimony. He also testified that the waters of Palm Canyon in 1935 and 1936 followed the course of the dyke after crossing Smoke Tree Point, and that the dykes did not interfere with the natural flow of the waters at that point.

An engineering expert, Mr. Adams, testified for defendants. Most all of his factual data was gathered years prior to the institution of this suit, while he was employed by the Coachella Valley Storm Water District. He testified that the waters of Palm Canyon in the flood of 1922, passed Araby Point right at the point but that he did not make any measurements as to the width; that in the 1921 flood, the waters ran adjacent to Araby Point and that he was hauled across the water on the road for a distance of 200 to 300 feet; that during the floods of 1921-1922 and 1925-1926 water was likewise immediately adjacent to Araby Point; that the width depended on how much water was running; that "the widest I saw water, or evidences water had crossed the road, there at that point, was 400 feet"; that water crossed the road immediately at Araby Point when there was none at other places; that he made his observations two days after the peak of the 1927 storm; that at some time during the flood, waters had covered "all of the area from Araby Point to a point

600 or 700 feet west of the bend." But he stated that this area had been sheet flooded and there were no defined channels west of the channel at Araby Point; that he noticed the west bank of Palm Canyon channel to the north of the highway and stated it was about a half foot above the bottom of the wash; that the wash at Araby Point from the east side to the west side was 200 feet.

In this connection, it should be borne in mind that the 1927 flood was the largest flood of which any record had been kept. He then testified that "90% of the waters of Palm Canyon flowed down along the foot of the Murray Mts." all the way to Araby Point; that that figure included all of the storms concerning which he testified, including the 1927 flood.

Several lay witnesses produced by the defendants also gave corroborating testimony concerning the location and width of the main channel. One testified that excluding the 1937 storm, after the main waters of the river subsided, the water ran in Palm Canyon wash 25 to 30 feet from Araby Point and was in substantially the same place each time. One witness testified that "the main wash extended from 100 to 200 feet west of Araby Point" and that there were no westerly banks to the wash at Araby Point, but they were slopes rather than sharp banks.

It is from Smoke Tree Point northerly to Araby Point that any difficulty is encountered with regard to the establishment of a definite channel or embankment, but even here there is substantial evidence to support the court's findings that a main channel did exist along the main wash, and it is admitted on both sides that the main wash extended along the foot of the Murray Mountains· and that there was an easterly embankment extending northerly to Araby Point. The evidence shows that the main wash ran between the two dykes and that the tilt of the cone is toward the east and the steepest gradients are along the foot of the mountains and that the natural tendency is for the water to flow along the foot of the mountains.

It will be seen from this summary that the west bank of the channel between the points questioned is defined more by the tilt of the cone and the gradual rise of the land than by any vertical bank on the ground. The trial court was justified in finding that the channel is from 100 to 200 feet in width and that any waters which extended beyond a dis-

tance of 200 feet from Araby Point were overflow waters which escaped from the channel. While the width of the channel from Smoke Tree Point to Araby Point cannot be definitely established as 170 feet, because sometimes water flowed in a channel 25 feet wide and other times 200 feet wide, nevertheless, the lower court found that the dykes were reasonably spaced as to location of the channel and as to where waters flowed in the channel prior to the time of the construction of the dykes.

In *Lux* v. *Haggin*, 69 Cal. 255, at page 418 [4 P. 919, 10 P. 674], the court said:

"It is not essential to a watercourse that the banks shall be unchangeable, or that there shall be everywhere a visible change in the angle of ascent, marking the line between bed and banks. . . . We can conceive that along the course of a stream there may be shallow places where the water spreads and where there is no distinct ravine or gully. Two ascending surfaces may rise from the line of meeting very gradually for an indefinite distance on each side. In such case, if water flowed periodically at the portion of the depression, it flowed in a channel. . . ."

A nearly analogous case to the instant one is *San Gabriel Valley Country Club* v. *County of Los Angeles, supra.* In that case, where the storm drain "follows the general direction of the wash and for some of the distance is laid in it, but for some of the distance departs from it" it was stated at page 406, that:

". . . an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; . . . the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel."

Another case quite similar in its facts to the instant case is *Archer* v. *City of Los Angeles, supra,* where the defendant straightened, widened and deepened a creek and its tributaries and constructed concrete storm drains to improve drainage. The Supreme Court, speaking through Mr. Justice Traynor, attempted, in a very able discourse on the law,

to reconcile all of the former cases decided by the courts of this state on the point involved. It was there stated at pages 26-27:

"The improvements must follow the natural drainage of the country. If the water is diverted out of its natural channel and discharged into a different channel or upon neighboring land, the diverter is liable to the owner whose land is injured by such discharge . . . Likewise there is no diversion if surface waters, flowing in no defined channel, are for a reasonable purpose gathered together and discharged into the stream that is their natural means of drainage even though the stream channel is inadequate to accommodate the increased flow . . . 'Not to permit an upper land owner to protect his land against the stream would be in many instances to destroy the possibility of making the land available for improvement or settlement and condemn it to sterility and vacancy. Such a rule would seriously interfere with the development of the country. Because of this, and because of the necessity of permitting the utilization for drainage of the means afforded by nature for the purpose, a very great preponderance of the decisions in other states go further than it is necessary to go in this case, and hold that a riparian owner has no right to complain because the volume of water in the stream is increased by artificially draining surface waters into it above, provided only the stream is the natural drainage channel for the lands so drained. . . . If the surface waters are gathered and discharged into the stream which is their natural means of drainage, so that they come to the land below only as a part of the stream, it is held that no action lies because of their being added.' "

Many of the cases cited by appellant have been analyzed and discussed in that opinion. We will not elaborate further, but suffice it to say that many of the cases cited were cases wherein the *trial court found* that the waters were diverted from their natural course and as a result thereof injured the plaintiff's land. In the instant case the trial court has *found otherwise*. Here considerable evidence was produced which might have supported a contrary finding had the trial court so determined, and a different question would then be presented to us. Under the time-honored rule, because of the presumptions in favor of the findings and judgment of the trial court, the appellate court, when reviewing the evidence in support of a finding, must accept as true all

evidence tending to establish the correctness of the finding, and it must consider it in the most favorable aspect toward the prevailing party and give him the benefit of every inference that can be reasonably drawn in support of his claim. ■ When the evidence is conflicting this court will presume that the evidence in support of the findings is true and construe it and resolve every substantial conflict as favorably as possible in support thereof. (*Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140 [134 P. 1157]; 2 Cal.Jur. p. 879, sec. 515.)

Some consideration must also be given to the fact that the trial judge visited the scene and made his own observations on the ground. (*Robinson* v. *County of San Diego,* 115 Cal.App. 153 [300 P. 971]; *Anderson* v. *State of California, ante,* p. 140 [142 P.2d 88].) The finding of the trial court on this issue will not, therefore, be disturbed.

■ We will next consider the question whether there was sufficient evidence to support the finding of the trial court that the construction of defendants' dykes did not cause the damage to plaintiff's land, that is, that there was no causal connection between the acts of the defendants and the damage, if any, done to plaintiff's land. While there was evidence that might have supported a court's finding to the contrary, there was ample evidence to support the finding as made. In this respect the witness Mr. Rowe testified as follows: "Taking into consideration the matters heretofore referred to, that is, my studies, my observations, my knowledge of the testimony and of the documentary evidence . . . the effect the construction of defendants' dyke had upon the flow of the waters of Palm Canyon River, I say that in my opinion the construction of defendants' dykes had very little effect, if any, upon the normal flow of Palm Canyon water at the time of the peak of the flow of the 1937 storm"; that "in my opinion the public dyke would have failed in the same manner in which it did, even if the defendants had had no dykes"; "that the same amount of damage would have been incurred on the south half of section 29 . . ."; and that "assuming that neither defendants' dykes nor the public dyke had been built, it is my opinion that the damage to the south half of Sec. 29 would have been identical to that which occurred during the flood of 1937."

In view of the evidence above related and the opinion of the expert witness, it appears that the finding of the trial court on this subject is sufficiently supported by the evidence.

Several exceptions have been taken to the admissibility of certain testimony and the court's rulings thereon. We have duly noted these exceptions and are thoroughly convinced that they were not prejudicially erroneous. The evidence supports the findings and the findings support the judgment.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied December 15, 1943, and appellant's petition for a hearing by the Supreme Court was denied January 20, 1944. Carter, J., voted for a hearing.