NOBLE SIGLER et al. v. INTER-RIVER DRAINAGE DISTRICT, Appellant.

Division One, December 22, 1925.

1. **DRAINAGE DISTRICT: Governmental Agency: Police Power: Damages.** The creation and exercise of the functions of a drainage district in this State is an exercise of the police power, and such a district is a governmental agency exercising only public governmental functions, and as such is to be classed with counties, road districts and school districts.

2. ———: **Overflow Waters.** The common-law rule as to surface water is in force in this State, and overflow water is surface water.

3. ———: ———: **Damage to Lands Outside District.** For the protection of lands within a drainage district from overflow by the flood waters of a river a levee may rightfully be built across

depressions, sloughs, swales and other low places, into which waters from the river escape only in flood time, and the building of such a levee which has the effect of raising the water higher on the lands between the levee and the river does not entitle the owner of such lands to recover compensation from the drainage district for the damage to them thereby caused, within the meaning of Section 21 of Article II of the Constitution, declaring that private property shall not be taken or damaged for public use without just compensation.

4. ———: ———: ———: **Police Power: Damnum Absque Injuria.** Protection from vagrant waters which in flood time escape from a river through sloughs and depressions, and spread out over low lands in the valley, by the construction of a levee which deflects such waters from the lands within the district and increases in flood time the overflow of lands not included in the district, does not transgress the limits of the police power, is not violative of Section 21 of Article II of the Constitution, and whatever injury the owner of low lands not included in the district suffers from such protection of the lands in the district is not a "damage" within the meaning of that section of the Constitution, and the drainage district cannot be held liable therefor.

Corpus Juris-Cyc. References: Drains, 19 C. J., Section 4, p. 607, n. 18; Section 12, p. 614, n. 72; Section 13, p. 616, n. 78; Section 196, p. 703, n. 29. Waters, 40 Cyc., p. 639, n. 11.

Transferred from Springfield Court of Appeals.

JUDGMENT OF CIRCUIT COURT REVERSED.

*W. N. Barron* and *Oliver & Oliver* for appellant.

(1) It is conceded that Black River overflows its banks, and that defendant district built its levee on the east side of the river to protect the lands within the district from the overflow water escaping from Black River. Such water is surface water. Goll v. Railroad, 271 Mo. 668; Drain Dist. v. Ham, 275 Mo. 388; Adair Drain. Dist. v. Railroad, 280 Mo. 253; Abbott v. Railroad, 83 Mo. 280; Wells v. Payne, 235 S. W. 488, par. 3; Vanlandingham v. Railroad, 206 S. W. 399; Brown v. Railroad, 248 S. W. 15. (2) The common-law doctrine

as to surface water obtains in the State of Missouri. Surface water is to be treated as a common enemy, and the lower proprietor may rightfully protect his property therefrom by any means available. Adair Dr. Dist. v. Railroad, 280 Mo. 252; Goll v. Railroad, 271 Mo. 668; Int. Riv. Drain. Dist. v. Ham, 275 Mo. 388; Abbott v. Railroad, 83 Mo. 283; Thompson v. Railroad, 137 Mo. App. 69; Thoele v. Planing Mill Co., 165 Mo. App. 717; Johnson v. Leazenby, 202 Mo. App. 232. (3) Palmer-Caney Slough does not constitute a watercourse. They have no source of supply except Black River, and then only when it is in flood stage. Water does not usually flow therein. Caney Slough has no continuous bed nor banks. Growing timber fills its so-called channel. When Caney has water in it from Black River the whole area is one broad sheet of water extending for miles and the so-called Caney Slough is utterly undefined. It is not a watercourse either in law or fact. McCormick v. Railroad, 57 Mo. 437; Munkres v. Railroad, 72 Mo. 516; Benson v. Railroad, 78 Mo. 504; Hoyt v. City of Hudson, 27 Wis. 661; Hoester v. Hemsath, 16 Mo. App. 485; Adair Drain. Dist. v. Railroad, 280 Mo. 252; Goll v. Railroad, 271 Mo. 668. (4) In order to constitute an actionable wrong two factors must concur; first, a wrongful act; second, injury resulting therefrom. Rex v. Commissioners, 8 Barn & C. 362; 1 C. J. 937, notes; Lamb v. Reclamation Dist., 73 Cal. 125; Bruner v. Martin, 76 Kan. 862. The building upon the bank of a river by defendant of a levee upon its own land to protect itself against overflow water escaping from such river is lawful in itself. There was no invasion of a right possessed by plaintiff. Hence no wrong or actionable act has been committed. Abbott v. Railroad, 83 Mo. 283; McCormick v. Railroad, 57 Mo. 433; Thompson v. Railroad, 137 Mo. App. 69; Goll v. Railroad, 271 Mo. 668; Mehonray v. Foster, 132 Mo. App. 231; Railroad v. Schneider, 30 Mo. App. 623; Adair Drain. Dist. v. Railroad, 280 Mo. 252; Inter-River District v. Ham, 275 Mo. 384. (5) The levee was built in the usual and ordinary manner by a State agency. It did

not unnecessarily injure plaintiff. There is neither allegation nor proof that it was built otherwise. The sole complaint is that it increased the height of the overflow on plaintiffs' property. Such injury is consequential and is *damnum absque injuria.* Inter-River Drain. Dist. v. Ham, 275 Mo. 389; Goll v. Railroad, 271 Mo. 655; Adair Drain. Dist. v. Railroad, 280 Mo. 252; Jackson v. United States, 230 U. S. 1; Hughes v. United States, 230 U. S. 24; Cubbins v. Miss. River Comm. 241 U. S. 351, 204 Fed. 303; Tenn. v. Directors, St. Francois Levee Dist., 249 U. S. 588; McCoy v. Plum Bayou Levee Dist., 95 Ark. 354; Gray v. Reclamation Dist., 163 Pac. 1031; St. Louis-S. W. Railroad v. Miller Levee Dist., 207 Fed. 338; Lamb v. Reclamation Dist., 73 Cal. 125; Board of Levee Commrs, v. Harkleroads, 62 Miss. 807; Board of Des Moines, 62 Iowa, 326; Taylor v. Fikes, 64 Ind. 167; Edwards v. Railroad, 39 S. C. 472; Smeltzer v. Borough of Ford City, 246 Pa. 560; McDaniels v. Cummings, 83 Cal. 515; Abbott v. Railroad, 83 Mo. 271; Schneider v. Mo. Pac. Ry. Co., 29 Mo. App. 68; City Oil Works v. Imp. Dist., 232 S. W. 28; Gray v. Schriber, 58 Mo. App. 177; Applegate v. Franklin, 109 Mo. App. 302; Johnson v. Railroad, 111 Mo. App. 378; Beauchamp v. Taylor, 132 Mo. App. 95; Mehonray v. Foster, 132 Mo. App. 229; Hoester v. Memsath, 16 Mo. App. 489. (6) The levee is upon land within the district owned by appellant and the property of plaintiffs is upwards of a mile distant. Injury to plaintiff's property that may have resulted from the construction of the levee does not amount to a taking of or damage to property for public use, within the meaning of Section 21 of Article II of the State Constitution. There can be no recovery for consequential damages inflicted upon the public unless the plaintiff has sustained special and peculiar damages affecting his property not suffered in common with all others who own property similarly situated. Such damages as are suffered in common are not included within the constitutional limitation. All parties owning land between the levee and

river were similarly affected in kind, but varying in degree, according to the elevation of their land. The Constitution will not be construed to give a cause of action against a corporation for the doing of an act which, if done by an individual, would be nonactionable. Rude v. St. Louis, 93 Mo. 408; Fairchild v. St. Louis, 97 Mo. 85; Conman v. St. Louis, 97 Mo. 92; Van De Vere v. Kansas City, 107 Mo. 83; Glasgow v. St. Louis, 107 Mo. 204. (7) It must be conceded that the defendant is a duly constituted governmental agency exercising only public governmental functions. D'Arcourt v. Little River Drain. Dist., 253 S. W. 966, 245 S. W. 394; Schwepker v. Little River Drain. Dist., 253 S. W. 968, 245 S. W. 400; Gates v. Bridge & Terminal Co., 111 Mo. 28; Funke v. St. Louis, 122 Mo. 138; Gorman v. Railroad, 255 Mo. 490; Peters v. Buckner, 288 Mo. 618; Penn. Railroad v. Lippincott, 116 Pa. St. 472; Railroad v. Waters, 216 Mass. 291; Davis v. Commissioners, 153 Mass. 218; Fort Collins Ry. Co. v. France, 41 Colo. 512; Canady v. Lumber Co., 21 Ida. 77; Brainard v. Railroad, 48 Vt. 107; Chicago v. Bldg. Assoc., 102 Ill. 64; Houston Ry. Co. v. Dallas, 84 S. W. 648; C. B. & Q. Ry. v. People, 72 N. E. 219; Frazer v. Chicago, 57 N. E. 1056; People v. Eberle, 133 N. W. 519; Stone v. Fritts, 82 N. E. 792; Chicago v. Bowman Dairy Co., 84 N. E. 913; Blach v. Glenn, 119 Pac. 67; Colville v. Fox, 149 Pac. 496; Hausgen v. Elsberry Drain. Dist., 250 S. W. 905, 245 S. W. 401; State ex rel. Kinder v. Little River Drain. Dist., 236 S. W. 848; State ex rel. Caldwell v. Little River Drain. Dist., 236 S. W. 15; Land & Stock Co. v. Miller, 170 Mo. 240; Drain Dist. v. Turney, 235 Mo. 90; State ex rel. v. Taylor, 224 Mo. 469; Morrison v. Morey, 146 Mo. 561; Barnes v. Const. Co., 257 Mo. 191; Wilson v. Drain. Dist., 257 Mo. 286; State ex rel. v. Little River Drain. Dist., 269 Mo. 458; Houck v. Drain. Dist., 239 U. S. 261; Little River Drain. Dist. v. Railroad, 236 Mo. 111. (8) The injury claimed by plaintiffs does not result from an exercise of the power of eminent domain. It results from an exercise of the police power of the State, acting

through an agency created by statute and called a drainage district. It was necessary to construct the levee to achieve the end for which the district was created, namely, to protect the public health and promote the general welfare of the State. The statute expressly authorized the construction of the levee and the damming or changing of watercourses. The district's acts were consequently lawful. There is no charge that the plan used by the district was arbitrary or unreasonable. It was the only method that could be used. (9) A lawful exercise of the police power must meet with uncompensated obedience, although injury result therefrom. Such an injury is not a taking nor damaging within the meaning of the Constitution. C. B. & Q. Railroad v. Illinois, 200 U. S. 561; Gibson v. United States, 166 U. S. 269; Scranton v. Wheeler, 179 U. S. 141; Bedford v. United States, 192 U. S. 217; New Orleans Gas Co. v. Drain. Comm., 197 U. S. 453; Northern Trans. Co. v. Chicago, 99 U. S. 635; Manigault v. Springs, 199 U. S. 473; Atlantic Coast Line v. Gladsboro, 232 U. S. 548; C. & A. Railroad v. Tranbarger, 250 Mo. 46, 238 U. S. 67; Block v. Hirsch, 256 U. S. 155; Omnia Commercial Co. v. United States, 261 U. S. 502; St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; State v. Mo. Pac. Ry., 242 Mo. 339; Eichenlaub v. St. Joseph, 113 Mo. 404; St. Louis v. McCann, 157 Mo. 308; State ex inf. v. Merchants Exchange, 269 Mo. 356; In re Kansas City Ordinance, 252 S. W. 404; Gray v. Reclamation District, 163 Pac. 1024; Indian Creek Drain. Dist. v. Garrott, 85 So. 312; Des Moines v. Manhattan Oil Co., 184 N. W. 823; Chicago v. Washington Home, 289 Ill. 206; People v. Johnson, 288 Ill. 442.

*Sheppard & Sheppard* for respondents.

(1) The questions raised by appellant have been passed upon adversely to its contentions. Schalk v. Inter-River Drain. Dist., 226 S. W. 227; Lee v. Inter-River Drain. Dist., 226 S. W. 280. The court in those cases held that whether or not such sloughs were watercourses

was a question to be determined by the jury. The facts in the case at bar are identical with those in the Schalk and Lee cases. (2) The cases cited by appellant do not seem to have any application whatever to the case at bar, but are applicable to the rights of individuals to drain their agricultural lands. (3) Regardless of whether or not a drainage district is a governmental agency created for the purpose of exercising the police power of the State, Article II, Section 21, of the Constitution of Missouri, makes it liable where it damages private property for public use. Bruntmeyer v. Squaw Creek Drain. Dist., 196 Mo. App. 360, 194 S. W. 748; Schalk v. Inter-River Drain. Dist., 226 S. W. 227; Tarkio Drain. Dist. v. Richardson, 237 Mo. 49; Inter-River Drain. Dist. v. Ham, 275 Mo. 384; Greenwell v. Willis & Sons, 239 S. W. 583; Bradbury v. Vandalia Dist., 236 Ill. 36. (4) The police power is always subject to the limitations placed thereon by the Constitution, and may never be exercised contrary to its provisions. State v. Julow, 129 Mo. 163; St. Louis v. Pub. Serv. Comm., 276 Mo. 276; State v. Mo. Pac. Ry. Co., 242 Mo. 339; Ives v. Railroad Co., 201 N. Y. 271; Smith v. Farr, 46 Colo. 364; Belleville v. St. Clair Turnp. Co., 234 Ill. 438; State v. Armour Packing Co., 124 Iowa, 323; State v. Hyman, 98 Md. 596; Black v. Schwartz, 27 Utah, 387; State v. Donald, 160 Wis. 21.

LINDSAY, C.—The judgment obtained by the plaintiffs in this case was affirmed by the Springfield Court of Appeals (257 S. W. 487); but that court, stating there was substantial ground for holding that its decision was in conflict with the decision of the Kansas City Court of Appeals in Arnold v. Worth County Drainage District, 209 Mo. App. 220, certified the cause to this court.

The case is one originally assigned to Judge Woodson, and re-assigned since his death. The suit of the plaintiffs, the owner of the land, and a crop tenant, is for damage done to their crops in the year

1919, and caused by an overflow of the Black River. The crops were upon lands lying wholly without the bounds of defendant drainage district. The substance of the charge in the petition is, that defendant, by its system of levees and drains theretofore made, cut and intersected various sloughs and natural drains and watercourses, and obstructed the flow of and tapped Black River, and turned and directed the waters flowing therein from their natural course, and collected them so that said waters were caused to flow and to stand on said land, whereby the crops were destroyed or damaged.

The Inter-River Drainage District comprises 127,000 acres of land. It extends from Black River on the west to the St. Francois River on the east, and from where the waters of these two rivers, leaving the foothills of the Ozarks, enter the low and flat country to the south, and thence, southward to the Missouri-Arkansas line.

The major elements of defendant's system of improvements consist of a great levee along the west bank of the St. Francois River, and a like levee along the east bank of Black River. Joined with, or servient with these, are lesser levees, and numerous ditches for drainage. The land of plaintiff Sigler lies on the east side of Black River, between the river and the levee, and near to and southeast of the city of Popular Bluff; but the main portion of that city is situated on the west bank of that river. Black River flows out of the foothills at a point about two miles northeast of Poplar Bluff. Coming out of the hills, it curves southwestward for three miles, approximately, and then, turning, curves southeastward for about the same distance, the line of its course forming a rough half circle.

Defendant's levee begins at a point about two miles northeast of Poplar Bluff and runs due south, upon range line 6 for approximately four miles, to a point near what may be described as the foot of the half circle, and near to the east or northeast bank of Black River. There the levee turns to the southeast, and thence follows, in a general way, the meanderings

of the river southeastward. The land in this bend, about 2,000 acres, is all outside of the district, and it is a body in the form of a roughly shaped half-moon, having the river for its western or convex and irregular boundary line, and the levee on the east for its straight boundary line. It was spoken of as comparable to the half of a bisected saucer. Along the west or river side of this straight north-and-south line of levee, the defendant constructed what is designated as a borrow-pit ditch. The east bank of the river in this bend, and generally, is about six or seven feet higher than the land to the east and southeast. The bank, at first slopes somewhat abruptly; thence gradually eastward and southeastward. The borrow-pit ditch, extending due south, cuts through the east bank of the river, and enters the river at a point near, and almost south of, the place where the levee turns from south to southeast. The levee is twelve or thirteen feet in height and made of earth. The ditch along the west side of it was made in excavating earth for building the levee. The ditch is from fifty to sixty feet in width and ten or twelve feet deep.

The land of the plaintiff lies a little more than one mile northwest from where this ditch enters the river.

The valley of Black River, through the hill country north of defendant district, is somewhat narrow, the fall considerable, and the flow of the water rapid where it reaches the low and comparatively flat lands forming the district. There are several natural openings in the east bank of the river within the bend that has been described. The water flows through these in times of flood, and in high floods over the bank generally, flowing eastward and southeastward. One of these openings was spoken of as the Ball Park opening, about one mile west of the Sigler land; another as the Bennett opening, about three-fourths of a mile southwest of the Sigler land.

The Sigler land consists of two forty-acre tracts lying east and west. From east to west, it is nearly in

the center of the basin that has been described, but from north to south it is somewhat south of the center. The elevation of the north side of the land is three feet higher than that of the south side. The testimony was that the water flowed through the Ball Park and Bennett openings when the river stood at 14.8 feet by the gauge. In the flood of June, 1919, involved here, the gauge was 16.4 feet. In the flood of May, 1915, it reached 18.7 feet. Plaintiff Sigler testified that the flood of 1915 was the highest which he had seen. The water was all over his land, and rose to a height of three and one-half feet at the buildings on his land. It was much deeper on the south portion.

By far the most extensive opening in the east bank of this bend in the river is the one called Palmer Slough. Palmer Slough is an opening in the east bank of the river, at a point east of the northeast part of Poplar Bluff, and a little more than a mile west of defendant's levee. The opening in the bank of the river constituting the head of Palmer Slough, is described by the witnesses variously, as from 200 to 300 feet in width, and near the river it has banks eight or ten feet high. The bed of the slough, at the river bank, is described as being four or five feet higher than the bed of the river. A dam is maintained across the slough near the river bank by a cooperage company and at a point 600 feet below, there is another dam maintained by the same company. The space between the dams is used for a logging pond. The water in the slough overflows the dam when the river reaches 11.6 feet on the gauge. Thus, in the flood in question, when the river reached 16.4 feet on the gauge, there was more than four feet of water flowing over the dams. The north line of the Sigler land is about three-fourths of a mile south, and slightly east, from the dam at the Palmer Slough opening. The topographic map introduced showed the elevation of the top of the dam to be 332 feet; the elevation at the north line of the Sigler tract, 331 feet, and at the south line 328 feet. From the south line of the tract southward  toward the northeast bank of the

river, the land rises. The elevation at the bank of the river south of the Sigler land is 334 feet. Palmer Slough, as all the witnesses agree, extends southward for a certain distance, about one-half of a mile with well-defined banks, and then, as all agree, "fingers out" to the east and southeast, in several branches.

Plaintiff's contention was and is that Palmer Slough connected with the other sloughs and lake extending east and southeast, and that before the construction of the levee there was through these lakes and sloughs, and by means of them, a natural watercourse, whereby a part of the water coming by overflow into the land embraced in the bend described, found its way into Black River, ten or twelve miles below the Palmer Slough opening. The contention further is, that by the construction of the levee and the borrow-pit ditch, all the water was forced to flow on the west side of the levee, in the ditch and into the river where the ditch enters the river, and that thereby, the water was held up in the mouth of the ditch, and stood to a greater depth on the land above, until the subsidence of the river permitted the water in the ditch to flow out freely and drain the land.

It seems to be conceded that when the river began to fall, the water drained off rapidly through the ditch. The particular slough which the plaintiffs undertook to show was a natural waterway and a connection, or partial prolongation, of Palmer Slough, and which was intersected by the levee, was called Caney Slough.

Certain roads crossing the body of land between the levee and the river are mentioned by the witnesses. The line of St. Louis-San Francisco Railroad coming from northeast to southwest, crosses Palmer Slough near where it opens out from the river. From a "Y" west of and near the head of Palmer Slough, the Butler County Railroad extends southeastward, and crosses defendant's levee at a point one-half mile north of where the borrow-pit ditch enters the river. This road cuts through the northeast corner of the Sigler land. A public road called the Black road, runs along the north line of the Sigler land.

North of and near the Black road, but not quite parallel with it from east to west, runs the Cairo branch of the Missouri Pacific Railroad (spoken of as the "Cat" railroad) which crosses the Butler County Railroad at a point about one-mile south of the head of Palmer Slough.

The evidence for both plaintiff and defendant shows that Palmer Slough, extending southward for about one-half mile, as it nears the line of the Missouri Pacific Railroad, turns eastward, splitting into four or five branches, which extend eastward about one-half mile, and that thence and from along that place, the water escapes southward through the trestle of the Missouri Pacific Railroad.

It appears from the record, that south and southeast from the trestle of the Missouri Pacific Railroad, the slough about which there is much evidence, is called Caney Slough. Its extent, and character, and whether it actually exists as a continuous water-course, or, as a water-course where it is claimed defendant's levee, running south on range line 6, intersects such slough or the line of it, was a sharply contested issue. Defendant asked for a peremptory instruction.

The Court of Appeals reviewed extensively the evidence, in view of defendant's demurrer, and summarized the evidence for plaintiffs concerning Caney Slough as a natural water-course. In doing so, that court followed the testimony of the witness Lee, called by plaintiffs, saying also that the testimony of certain others who accompanied Lee at the time of which he spoke, substantially corroborated testimony. This summary of Lee's testimony we take from the opinion, 257 S. W. l. c. 488:

"H. A. Lee, a witness for plaintiff, testified that he was acquainted with the Sigler land; that the water got over it in June, 1919; that the water backed out of the borrow-pit ditch and onto the Sigler land; that his own land is about a mile south of the Sigler land; and that prior to the construction of the levee and borrow-pit ditch his land was not bothered with water; that he had

traced the alleged natural watercourse from beginning to end, and found 'a watercourse all the way through; that he, with others, Kenier, Moore, Robinson, Stallings and Loveless, traced the watercourse from where it came out of the river under the name of Palmer Slough, and found that it went back into the river several miles below; that Palmer Slough is 300 or 400 feet wide and ten or twelve feet deep, and extended south about a half mile to the Missouri Pacific Railroad, and there turned east and spread out in four or five branches; that these branches had well-defined banks, and went east about a half mile, and then came together, and went under the Missouri Pacific as a trestle about 200 yards west of the levee and borrow-pit ditch; that where the slough passed under the railroad it had banks and bed; that the slough or watercourse where it passed under the railroad was 'rather a lake;' that after passing under the railroad the slough, under the name of Caney Slough, ran generally south, and crossed the Black road, and at that point was forty or fifty feet wide and eighteen inches to two feet deep, and had banks. (Black road is the public road running east and west along the north side of the Sigler land.) Lee further testified that before the levee and borrow-pit ditch were constructed, Caney Slough crossed the line of the Black road under a bridge 125 feet wide, and then ran about 200 yards to the southeast and crossed range line 6, upon which the levee and borrow-pit ditch were constructed, and that Caney Slough where it crossed the range line was, prior to the construction of the levee and borrow-pit ditch, about forty or fifty feet wide and about two feet deep; that after crossing the range line it ran east, or nearly so, for about a quarter of a mile about the same size as at the range line and then turned southeast and then became 'a large slough,' and continued for about a half mile as a 'deep slough with high banks;' that then the banks ran 'down again, but there was a good running stream all the way through,' that about a half mile further the slough, still under the name of Caney Slough, ran through high ground and had higher banks;

that this last-mentioned point is a mile and a half or two miles from where Caney Slough crossed the range line; that the banks at this point were eight or nine feet high, and the slough 75 or 100 feet wide; that Caney Slough then continued as a 'good-sized slough' until it entered Big Cypress, which was a cypress brake; and that there was a channel through the cypress brake; that Big Cypress ran generally to the southeast and into Catherine Lake; that the part of the watercourse under the name of Catherine Lake ran into Lake Slough, which was fifty or sixty feet wide and three or four feet deep; and that Lake Slough connected with the river. Lee testified that, prior to the construction of the levee and borrow-pit ditch, water, in time of overflow, ran throughout this succession of sloughs, and that prior to the construction of the levee and borrow-pit ditch the water that got on the Sigler farm came from the northwest; but since the construction of said levee and borrow-pit ditch, the water came from the southeast upon the Sigler farm.

"On cross-examination Lee further testified that Caney Slough bottoms were three or four miles wide, and in time of overflow were covered with water:

" 'Q. I thought you said it spread over the whole face of the earth for three or four miles to your knowledge. A. I said it might do that. I suppose it goes from the high rim on the river bank to the sand hills. It is low country in there.

" 'Q. What becomes of your friend Caney Slough at such times as that? A. It is down there in the middle of it, doing all it can. It is down there in the bottom of it, in the middle, and water on both sides of it, and over the top of it, I guess. I don't think it is lost in the general submergence of the country. I think you could find it by the current. If anybody went to cross it, you could very distinctly tell when they went to cross Caney Slough.' "

Under the evidence the Court of Appeals held that plaintiff was entitled to go to the jury upon the question whether defendant obstructed a watercourse, and also upon the question whether the defendant's improve-

ments increased the flow of water on plaintiffs' land, and, further held, that the defendant, although a governmental agency, and as such exercising public functions, was not immune from liability for the damages resulting.

The evidence for plaintiffs was to the effect that, after the construction of the levee and ditch, the water backed up higher on the Sigler land and other land adjacent than it had formerly done at a like stage of water, as shown by the river gauge. One of defendants' witnesses, a civil engineer, gave it as his opinion, on cross-examination, that the levee and borrow-pit ditch, in time of overflow, would cause the water to be higher in the territory in the bend than before the construction of the levee and ditch. As further explanatory of the character of Caney Slough, and of the conditions within the bend that have been mentioned, and also conditions east of the levee, we refer to some of the other evidence for plaintiff, as well as to evidence introduced by defendant.

Hartridge, one of the plaintiffs, a tenant on the Sigler land, on cross-examination said:

"After the water comes out of Palmer Slough it passes under the Cat Railroad through the long bridge. Below the Cat Railroad we term it Caney Slough. Before the construction of the levee there was a bridge across Caney Slough about where the bridge is now across the ditch. Just a little this side was another bridge across the same road. Caney Slough is just a low, flat place where the water passes through that flat land. It was just a little, narrow channel with banks ten or fifteen inches, but water flowed down there and we called that Caney Slough, and they ran a levee right across that.

"Right where the levee crosses it I do not know how wide it is, nor how deep. At that particular place there is very little banks. I could not state the height of the banks in feet, because I haven't measured it. I don't know anything about that. Right at that point or any other point I never have measured the banks of Caney Slough, and I don't know how deep it is. There are only

very little banks at that point, there is very little banks there of any kind. At that particular point where the levee crosses, really, I don't know that there is any banks at all there.

"There was some timber at the point where the levee crosses Caney Slough before the construction of the levee, little old hardwood, different kinds of stuff, cypress and gum and such as commonly grow in those flat places, the same kind of timber that covered the surrounding country."

He further testified: "There is some channel up where the Black road crosses. The banks play out before you get to the levee. North of the Black road, I don't know of any place where the banks entirely play out."

Again in his testimony, he said: "I am unable to answer whether the slough is lower at the Black road than where the levee intersects it. It takes the same amount of water down there as it does at the bridge. I will say the slough is as big down there as it is at the bridge. I have seen the water there where the slough and levee come together six feet deep. I said at times it was dry, too. I said I expected it was six or eight feet deep in times of flood. Except in times of flood there was no water right at that point. There is no flowing water there except in times of flood. The channel is wider at the levee than it is up at the Black road crossing. I don't know how much wider. I know the same water goes over there and there is very little bank, if any, right where that crosses. Right at that point I don't know of any banks. If there is any there is very little.

"Q. It takes banks to make a channel, doesn't it? A. Yes.

"Q. Then there is no channel there, is there? A. Not under that levee there is not.

"Q. Before the levee was put there, there and thereabouts? A. There was a current.

"There is some channel up where the Black road crosses. The banks play out before you get to the levee. North of the Black road I don't know of any place where the banks entirely play out."

Other witnesses for plaintiff described Caney Slough as it was, at and near the levee, and described it as eighteen to twenty-four inches deep and from forty to fifty feet wide, and somewhat indefinite as to banks. It is said of it and others that in places it "just spreads." Trees, weeds and grass grew in place or course of Caney Slough as it was described, of the same character as grew elsewhere in the bottom.

The witness Kenier, called by plaintiffs, describing the general character of Caney Slough and the land adjacent, said: "This so-called Caney Slough ran down east of the levee a certain distance, and sometimes it has a bank and sometimes it hasn't, and finally it drops into what I call Big Cypress. This Big Cypress is a cypress flat, I would call it. I don't know just how wide the cypress flat is. I have been across it, but can't say just how far it is. In places the brake is about a quarter or a half mile wide, and what I call Caney Slough empties into that brake and stays in that brake, I suppose, until it gets to Catherine Lake. When I say it is half a mile wide I mean from east to west. I could not say how long that brake is from north to south. From where Caney Slough runs into it on to Lake Slough it is probably a mile or a mile and a quarter. Half a mile wide and a mile or a mile and a quarter long to where it hits Catherine Lake. I could not say whether there are any other sloughs running into that brake; not any that I know of particular. There might be; I haven't noticed any in particular."

Loveless, another witness for plaintiff, testified: "Some of these sloughs are connected and have channels of varying size, and then they drop into a large area of low, wet land, that they call a spread, which is a large area of low, wet land, and at other places they disappear into large cypress brakes in which the water stood all

the year round. I have never been across that Big Cypress and do not know how far it extends. My travels never carried me to the east side of it any farther than what they call the sand hills, but it goes that far. I don't know what section the sand hills are in. The water stands in these cypress brakes in ponds, and did until they dug the ditch, all the year around. There would be ponds where water would stand the year around. May be some of them would cover half an acre. I don't know of any places one hundred acres in extent where it stood the year around.''

Defendant introduced a large number of photographs showing the objects and conditions in the locality, and showing the place designated as the point where Caney Slough is crossed by the levee as evidence that there was not a channel there, nor any channel crossed by the levee, and also put in evidence certified copies of township maps covering the places in question made upon Government surveys, showing water courses, but which did not show any watercourse at the place where Caney Slough was said to be located, or watercourse at the place where plaintiffs' witnesses said Caney Slough was intersected by the levee. Several engineers and many other persons introduced by defendant testified that there was no continuous channel or watercourse, and that in flood times the water spread out for miles. All of the evidence is to the effect that there were no springs as a source of water supply to Caney Slough, or to any of the sloughs, spreads or lakes in the bottom, and that the only water coming into them was the overflow water of Black River, and such rainfall as fell upon the surface. As we understand the statements in the record, the levee and borrowpit ditch were not completed until about the end of 1918. Defendant introduced in evidence the gauge readings of the high stages respectively reached by Black River at periods of overflow in the years 1911 to 1918, inclusive. These readings, the correctness of which was conceded, showed stages varying from 12 feet to 18.5 feet. Of stages of water in that period and between those limits,

there were shown two in 1911, five in 1912, three in 1913, two in 1914, six in 1915, one in 1916, three in 1917 and four in 1918.

According to the evidence, in all of these floods there would be and was an overflow of the water of Black River over the dam across Palmer Slough, varying in depth from a few inches to five, six or seven feet. This since the water began to flow out of the river, over the dam, when the stage of 11.6 was reached on the river gauge. The readings showed, in this period, a stage of 18 feet or more four times, a stage of 17 feet twice, a stage of 16 feet or more four times, of 15 feet five times, of 14 feet three times, of 13 feet three times, and of 12 feet twice.

As to the frequency with which floods overflowed the Sigler and other land, and the depth of such floods, there is conflict. Plaintiff Sigler said: "If a flood in 1915 put 3.5 feet of water on the land, a flood of 15 feet in 1915 would not have put the water over my land, because it had more chance to get off. There was not near as much water in the country, didn't as much come down the river. You take a 15-foot gauge and it doesn't fill up the low land between the river; that is, all of the low land. The water did not seek its level because there was not enough of it. As long as the water is pouring down the river with a head eighteen feet high it will fill all the low lands within a mile. My land is within a mile of the river, northwest and south.

"Before the levee was built a flood of 18 feet 7 inches would put 3.5 feet of water over my farm, but a flood of 17.5 feet never did put 2.5 feet over my farm.

"In January, 1916, following the August flood, the water got over my farm. I don't know what the gauge reading was then, but it was not as much as in August prior. It lacked something like six inches of being as high. I could not say how deep the water got on my farm at that time. I don't believe I was out when it was highest. I was out when the water was considerably over

311 Mo. Sup.—13.

the farm, but I wouldn't say how much. I think perhaps two feet.''

In his direct examination he had said: ''During the high waters prior to 1919, the river would have to get 17 feet high on the Vine Street Gauge for the water to get over the entire farm. The back part of the farm would get some water on it with a flood stage of 14 or 15 feet on the gauge. It would take around 17 feet and over to get the cultivated portion of the farm—that is, prior to 1919.''

Plaintiff Hartridge testified as to conditions in May, 1918, when there was a stage of 18 feet. On cross-examination he said: ''Water comes through Palmer Slough only when Black River is in flood. The width of that channel is 200 feet. It takes about ten feet to put the water over the dam. The highest I have known the river to rise was something over eighteen feet on the gauge. If it takes ten feet to get over the dam it would rise as much as eight feet after that.

''Q. Explain to the jury how that column of water, 200 feet wide and 8 feet deep, how you managed to get that in that channel that you say is 40 feet wide and three feet deep at the Black road? A. Well, Mr. Barron, when we had that 18 feet of water I think we had a channel here about eight miles wide.

''Q. You don't mean to say it was eight miles wide? A. It must have been. It went clear to Blue Springs. I would not attempt to put all that water in that little channel. It would just spread out over all that country before the levee was built. It went over there and spread out until it got the flood out of Black River. I think we had a channel eight miles wide, because we had water on both sides of the river, and so far as the channel is concerned we know that water was not in a channel, and it would be useless to attempt to put that water in a channel of Caney Slough or Black River or half a dozen like it.''·

It appears to be a fact conceded that without the borrow-pit ditch on the west or river side of the levee,

the flood waters would be confined between the levee and the east bank of the river, which is higher than the adjacent land, and thereby the land in the bend converted into a lake. There was a showing that prior to the time of the organization of defendant district there had been a levee constructed on the west side of Black River, resulting in raising of the height and flow of water on the east side of that river, and that the land owners in the bend had refused to join in the organization of defendant district. Plaintiffs also introduced in evidence a petition filed in 1921 by defendant district, seeking to condemn land in the bend for a holding basin, on the ground that the levee and borrow-pit ditch raised the water. It was introduced as an admission of fact by the defendant.

As we have before remarked, the Court of Appeals held there was evidence to go to the jury upon the claim that defendant's levee obstructed a natural watercourse, and that thereby, and by means of the borrow-pit ditch, plaintiffs' land was overflowed to a greater extent than formerly, at a like stage of water in Black River; and held, also, that the governmental character of defendant district did not relieve it from being liable for damages. In so holding, the court followed its own ruling in Schalk v. Inter-River Drainage District, 226 S. W. 277. It appears from the statement in that case, that the land of the plaintiff was located in the bend of the river, here in question. The ruling in the Schalk case followed the ruling of the Kansas City Court of Appeals in Bruntmeyer v. Squaw Creek Drainage District, 196 Mo. App. 360. The ruling is put upon the provision of Section 21, Article II, of the Constitution, that private property shall not be taken or damaged for public use without just compensation, and on the grounds that said provision is self-enforcing, without the aid of any statutory provision; and that, though a drainage district constitutes an arm of the State created in the exercise of the police power, the police power is subject to limitations placed thereon by the Constitution, and cannot be exercised contrary to the provisions of the Con-

stitution, that is, cannot be exercised in contravention of the provision of Section 21 of Article II.

Upon the question of liability of a drainage district for damages to lands outside the district, the opinion of the Court of Appeals carries the statement that this court in State ex rel. Hausgen v. Allen, 250 S. W. 905, quoted with ''apparent approval,'' what was said by that court in Greenwell v. Wills, 210 Mo. App. 651. Greenwell's case was a suit by an owner of property within a district against a contractor and the district, charging negligence in the manner of making the improvements, to the injury of plaintiff's property. The appropriate holding of the Court of Appeals in that case was, that if the manner of the prosecution of the work was proper, the plaintiff could not recover from the district, because his damages had been awarded in the organization of the district; and if the work was prosecuted negligently, he could not recover against the district, because there was no statute authorizing a suit against the district for negligence. On the way to that conclusion which disposed of that case, whether the work was done properly or negligently, the court referred to the Bruntmeyer and Schalk cases, and also to Bradbury v. Vandalia District, 236 Ill. 36, as cases holding that the owner of property situated outside of a district could recover by virtue of the constitutional provision. It was said (210 Mo. App. l. c. 665): ''Thus the law in this State is that one whose lands or crops outside the district have been damaged by the prosecution of the improvement may maintain a suit against the district for his damages under the constitutional provision mentioned.'' That sentence was contained in the quotation set forth in the opinion in the Hausgen case. But in the Hausgen case the opinion in direct terms confined what was there said to a decision in that case, wherein the property involved was within the district and negligence was charged, and it excludes expression of views as to the liability of a drainage district in respect of property situated outside of the district where negligence did not enter the case as the basis of

the recovery sought. There is another expression in the opinion in the Hausgen case which should be mentioned here. Reference was made in that opinion to Bungenstock v. Nishnabotna Drainage District, 163 Mo. 198, wherein the plaintiff, as owner of land outside the district, was permitted to recover. Of that case and holding it was said in the Hausgen case, 250 S. W. l. c. 907: "There the land damaged was outside of the district. There the district had condemned a right-of-way of land not in the district, for its ditch, and had paid the damages assessed against it in favor of the landowner. After all this by negligent conduct and by a negligently devised plan, the land of this owner was further damaged. The question was not so much a question of negligence as it was the further appropriation of plaintiff's property to a public use, without compensation."

The Hausgen case, following other cases, holds that drainage districts as governmental agencies are not liable for negligence. In the case at bar, there is no allegation of negligence and there was no condemnation of any part of plaintiff's land, the east line of which was three-fourths of a mile west of the levee. The question here is one of liability for damages consequent solely upon the location and nature of the improvement made.

The question of the liability of a drainage district for consequential damages resulting to property outside its limits was before this Division in the recently decided case of Anderson v. Inter-River Drainage & Levee District, 309 Mo. 189, 274 S. W. 448.

The cases cited by counsel in this case were under consideration in that case, and the utterances of the appellate courts of this State, and of other states, and of the Supreme Court of the United States upon the chief questions here in issue, were somewhat extensively set forth. That case involved the levee built along and near the west bank of the St. Francois River, which, it was claimed, increased the flow of water upon and damaged lands of the plaintiff, on the east side

of that river. Concededly, the effect of the levee de-scribed in that case, was, to prevent the water which formerly, in time of flood, escaped over the west bank, from flowing over the lands in the district to the west and to throw the water in greater height and volume upon lands on the east bank. The right to recover was denied to the plaintiffs in that case, upon the ground that the defendant was an agency of the State created and operating in the exercise of the police power, and also that under the facts the defendant had done no more than the landowners might have done without incurring liability to the plaintiffs and others.

The fundamental question in this case is that of whether the plaintiffs' property was damaged within the meaning of the Constitution. It cannot be denied, and is conceded by the plaintiffs, that the creation and exercise of the functions of the drainage districts in this State is an exercise of the police power of the State. It is settled, too, that such a district is a govern-mental agency exercising only public governmental functions, and as such, to be classed with counties, road districts and school districts. [Morrison v. Morey, 146 Mo. 543; Land and Stock Co. v. Miller, 170 Mo. 240; Wilson v. Drainage District, 257 Mo. 266; State ex rel. McWilliams v. Little River Drainage District, 269 Mo. 444; State ex rel. Caldwell v. Drainage District, 291 Mo. 72; State ex rel. Hausgen v. Allen, 298 Mo. 448; Anderson v. Inter-River Drainage District, 309 Mo. 189.]

The common-law rule as to surface water is in force in this State, and overflow water is held to be surface water. [Abbott v. Railroad, 83 Mo. 271; Adair Drainage District v. Railroad, 280 Mo. 244; Inter-River Drainage District v. Ham, 275 Mo. 384; Johnson v. Leazenby, 202 Mo. App. 232.]

In the Bruntmeyer case the decision was put upon the ground that the district had "cut and intersected creeks and watercourses" and had diverted the water therein from their natural course, and "after collecting

said water'' had conducted it to a point or points near to plaintiffs' land, which was outside the district, whereby damage was inflicted, and that such damage was one within the meaning of the constitutional provision. The precedent followed in that case was the decision in Bradbury v. Vandalia Drainage District, 236 Ill. 36, upon the effect of a constitutional provision, the equivalent of Section 21 of Article II of our Constitution. The conclusion reached by the Illinois court was adopted, notwithstanding the fact that the Supreme Court of Illinois, in reaching its conclusion, proceeded upon the theory that the organization of the district and the proceeding thereunder was not an exercise of the police power, and upon the ground, expressly stated, that the rights of drainage districts in Illinois were governed by the civil-law rule, and upon the further ground that the act under which the defendant district was incorporated made the district liable for all damages which might be sustained from any levee, ditch or drain in such district. In this State no statutory provision is made applicable to lands outside the district not sought to be condemned. In Drainage District v. Ham, 275 Mo. 384, it was held that the exceptor, part of whose land was outside the district, could recover, but it was so held in consideration of the fact that the proceeding in that case was one for condemnation of a part of his land for a levee which bisected the land, and left a part of it between the district and the river. In that case it was said, l. c. 388: ''Appellant contends that overflow water from a stream is surface water and that one proprietor of lands has the right to shut off such surface water from his land without being liable to another proprietor for the damage thus caused. That rule must be conceded.'' In the opinion in that case there is the further statement: ''Appellant cites Jackson v. United States, 230 U. S. 1, and Hughes v. United States, 230 U. S. 24. In both those cases levees were constructed, but not on the lands of the complainants. Increased overflow of those lands was

caused thereby. It was held that there could be no recovery. If the appellant were proceeding to build a levee leaving all of respondents' land between the levee and the river, those cases would be in point. As it is, they do not apply." .

The testimony in this case from what we have set out, shows that the water which came out of Palmer Slough and other openings and over the banks in time of flood, spread over a territory many miles in extent. Palmer Slough in a very short distance spread out in branches, and a little further on the only claimed watercourse was Caney Slough, which, under plaintiffs' evidence, was no more in some places than a depression somewhat lower, for a width of forty or fifty feet, than the surrounding land. It was no more than this where it was shown the levee crossed. Neither it nor Palmer Slough had a water supply, except that from the occasional overflows of Black River. In times of flood, Caney Slough, along where it was crossed by defendant's levee, was a slight depression or swale, in the midst of water spread out for miles. It is not readily conceivable that in the construction of a levee, extending for many miles, it would be possible to avoid constructing it across depressions, swales and low places.

In defining a watercourse this court said in Munkres v. K. C., St. Joseph & Council Bluffs Railroad, 72 Mo. l. c. 516: "A watercourse is a stream or brook having a definite channel for the conveyance of water. It may be made up, more or less, from surface water from rains and melting snow, but after it enters into a channel and commences to flow in its natural banks, it is no longer to be considered surface water, and it is not essential that the water should continue to flow in such stream constantly the whole year around; it is sufficient if the water usually flows in such channel though not continually. That is, to constitute a branch or stream there must be something more than a mere surface draining, swelled by freshets and melting snow, and running occasionally in hollows and ravines, which are generally dry. The

water must usually run in a definite bed or channel, though it need not flow continually the year round. But although the water from high lands and hills may unite and form a stream with a definite channel, yet if it afterward ceases to remain a channel, but spreads out over the surface of low lands, and runs in different directions in swags and flats without any definite channel, it ceases to be a stream or watercourse.''

Again Judge GOODE, in Johnson v. Railroad, 111 Mo. App. l. c. 385, said: ''Now it is universally agreed by the courts and text-writers that flood water of a stream which entirely escapes from the bed of the stream, passes beyond even its flood banks and spreads over the adjacent country, is surface water and may be treated as such by every one. [Munkres v. Railroad, 72 Mo. 514; Railroad v. Schneider, 20 Mo. App. 620; Farnham, Water & Water Rights, sec. 879, p. 2559; Railroad v. Hay Co., 149 Ind. 269.]''

There are two lines of cases dealing with the question of liability in cases of this kind, one having in view the provisions of the Constitution of the United States, the other a provision of a State Constitution such as we have, as these provisions apply to claims for damages done by drainage districts to property, outside of the boundaries of the district, involving cases wherein the property was between a levee and a river. In both, the determination of the question has proceeded upon the theory that the reclamation of swamp and overflowed lands is a public enterprise referable in its purpose and accomplishment to the exercise of the police power, and that drainage districts are governmental agencies. Federal cases, discussing the question in a large way, are the decisions in Jackson v. United States, 230 U. S. 1; Hughes v. United States, 230 U. S. 24; Cubbins v. Mississippi River Commission, 241 U. S. 351. To these may be added St. Louis Southwestern Ry. Co. v. Miller Levee District, 207 Fed. 338. The substance of the doctrine announced in these and other decisions of the Federal courts, having in view the rights of property-owners un-

der the Constitution of the United States, is succinctly stated in 5 Encyc. of U. S. Reports, page 612, as follows: "Private interests are subservient to the right of the State in the exercise of the police power to carry out a system of drainage designed to benefit and protect the public health from the injuries arising from swamp and overflowed lands, and except where property is taken for which compensation must be paid, such interests must give way to any general scheme for the reclamation or improvement of such lands. The drainage of large bodies of swamp and overflowed lands, even though done for the purpose of reclaiming them for agricultural purposes, and not for the purpose of promoting the public health, is a public purpose and a proper exercise of the police power of the State, and damages resulting to property through the carrying out of such a scheme are *damnum absque injuria,* and do not constitute a taking of property under the Fourteenth Amendment."

The other line of cases consists of decisions of courts of several of the states in each of which was a constitutional provision identical with or equivalent to Section 21, Article II, of the Missouri Constitution. Among these, the case of McCoy v. Board of Directors of Plum Bayou District, 95 Ark. 345, is one which in its facts is strikingly similar to the case at bar. In that case, the land of the plaintiff was outside the district and near the lower end of a large bend of the Arkansas River. The levee, as here, was constructed across the bend instead of following it. It was constructed across a slough which was described as a swag or depression, about one and one-fourth miles in width, through which the water ran in times of flood, and only in times of flood, and constructed also across a cut-off connecting Plum Bayou and the Arkansas River. Plum Bayou was a natural watercourse. Both the slough and the bayou had their beginnings some miles above, or north of the plaintiffs' land. The decision proceeded upon the theory that the improvement increased the height of the water on the plaintiffs' land above what it formerly had been, and

caused damage. The issue as stated by that court, l. c. 349, is substantially the issue in this case giving the evidence of these plaintiffs its full value. "The question is therefore presented whether or not, for the protection of lands from inundation by the flood waters of a river, a levee may rightfully be built across depressions, swales and low places so as to prevent the escape of the flood water into surrounding low lands sought to be protected; and also whether or not, in order to prevent the spread of flood water and to protect lands which would otherwise overflow, the building of a levee which has the effect of raising the water higher on the lands between the levee and the river calls for compensation to the owner of such lands thereby damaged." The conclusion of the court was that no right had been violated, and no injury done for which the law afforded compensation, and held this to be so under consideration of the provision of the Constitution, that "private property should not be taken, appropriated or damaged for public use without just compensation therefor." In proceeding to the solution of the questions that have been stated, the court said: "The solution of these questions is not free of difficulty, and there are but few decisions of the court which shed much light on them. The first inquiry would seem to be as to the characterization of flood waters overflowing a stream, to return again as they recede—whether they should be treated as surface water or as running water of the stream. But we are not sure that such an inquiry is essential to a solution of the question now presented, for, without calling it surface water, we may treat it, like surface water or the waters of the sea, as a common enemy which any landowner or body of landowners or public agency may defend against without incurring liability for damages unless injury is unnecessarily inflicted upon another which, by reasonable effort and expense, could be avoided. [Little Rock & Ft. S. Ry. Co. v. Chapman, 39 Ark. 463; Baker v. Allen, 66 Ark. 271.]" The court, to like effect, quoted from Kansas City M. & B. R. R. Co. v. Smith, 72 Miss. 677; Lamb v. Reclamation Dis-

trict, 73 Cal. 125; Hoard v. Des Moines, 62 Iowa, 326. The decisions in Lamb v. Reclamation District was rendered prior to the time when the Constitution of California was amended so as to include the word "damaged." Subsequently, that word was made a part of the provision of Constitution of California, and the question in its relation to the provision as so amended, arose in Gray v. Reclamation District, 163 Pac. 1024.

In both of the California cases mentioned, the correlative rights of drainage districts and of owners of lands outside of such districts are extensively discussed. In Lamb v. Reclamation District, the action was one to abate and remove, as being a nuisance, a levee that for some time had been in existence along the west bank of the Sacramento River, and across a place on said bank called Wilkins Slough, and also to recover damages. The opinion is long and in view of the length of this opinion extensive quotation from it cannot be made. But it discusses the rights of parties from every angle and reviews many authorities. The conclusion was that since Wilkins Slough had no original water of its own, but was simply a conduit by which occasionally water from the river escaped into lower lands adjoining and since the same office was performed by every other low place along the bank, every other part of the levee could be removed, if the levee across Wilkins Slough could be removed, and denial of that relief was made and denial of any right to damages. Substantially the same natural conditions existed in the later case of Gray v. Reclamation District, 174 Cal. 622, 163 Pac. 1024, wherein a mandatory injunction was asked to restrain further prosecution of the work of improvement, based upon damage occurring while it was in course of construction, and upon the manner of its construction. The court went fully into the physical aspects of the case, discussed the project in its character as an exercise of the police power of the State, and, in respect to the rights of drainage districts in the exercise of that power, followed the line of Federal decisions on that subject, and held that the addition of the

word "damaged" to the Constitution did not, "touching the exercise of the police power, give a right of action for damages .which theretofore were *damnum absque injuria.*"

The question in some form or other has been before the Supreme Court of Mississippi many times.  The case of Indian Creek Drainage District v. Garrott, 85 So. 312, was one arising subsequently to the amendment of the Constitution of Mississippi in the particular heretofore mentioned.  The court in its opinion discussed physical conditions which may be likened to those shown in the instant case.  It appears from the evidence that at times the overflow waters of Black River in their wanderings reached the St. Francois River, and at other times waters from the latter reached Black River.  The court said at page 318:

"On the first proposition we think that when the flood waters left the channel of Coldwater River and spread for miles upon the lands in the basin or adjacent valley, they are to be characterized as vagrant flood waters as distinguished from ordinary surface or rain waters, or regular running stream waters.

"The complaint of appellees is not against the obstruction of the latter kind of waters, but it is against the damming of the flood waters that left the river channel and spread indiscriminately for miles over the land in the basin.  A portion of these waters were wont to pass out further into the basin through outlets that were obstructed by the levee; therefore we shall now deal solely with vagrant flood waters, against which the levee was built for protection, and which resulted in damaging appellees by diverting them upon their lands.

" (1) The question then is, Did the levee commissioners have the legal right to protect the lands in the district by leveeing against these waters, and thus incidentally throwing them upon the owners outside of the district?  We think so.

"Such diversion of vagrant flood waters, when incident to and reasonably necessary to the effective pro-

tection of the lands in the levee district, is within the phrase '*damnum absque injuria.*' The damages resulting are without legal injury, and must be borne for the common good. The act causing the damage is done for protection against the common enemy—roaming flood water. It is similar in principle to the right to protect from violence against an outlaw who runs amuck, even though a neighbor is incidentally hurt in the exercise of the right.''

The court next discussed the effect of the word ''damaged'' as incorporated into the provision of the State Constitution, and, in doing so, referred to the decisions of the Supreme Court of the United States, which have been heretofore mentioned, and to the case of McCoy v. Board. of Directors, supra, and adopted the conclusions reached in those cases. Farther on, the court discussed, as follows, certain natural conditions in a way which is enlightening, and .appropriate to the conditions shown in the case at bar. It was said at page 319:

''Coming now to the second question as to the right to obstruct the outlets or watercourses connected with the river, we shall proceed at once to the point.

''There is no complaint in this case about obstructing the watercourses and thereby diverting the natural and regular flow of the waters of. these channels. But the evil complained of is the obstruction against the vagrant flood waters which would partly pass out upon the valley through these outlets. These watercourses or outlets were inactive bayous, sloughs, and depressions which amounted to mere conduits or passageways for foreign flood waters. They were not natural running streams nor regular flowing watercourses. It is true some of them contained waters of their own, but it ordinarily flowed in no direction. There was no regular and continuous current in these natural watercourses. The levee did not interfere with the flow of their own waters, because they had no flow except that produced by the flood waters from the river. Therefore the levee obstructed only flood waters which at unusual times passed through

these outlets or conduits. The principal function of the outlets was to assist in carrying off flood waters which had left the river channel and spread over the outlying lands. These flood waters would pass partly through these outlets, but the greater portion would spread over the land south and east for several miles, and then finally go back into the river channel. These flood waters did not pursue these outlets and return directly to the river channel through them, but they spread out for several miles over the lands and into the bayous, sloughs, and depressions before returning to the river.

"We think the levee commissioners had a right to build the levee across these outlets in order to protect against the flood waters. Such obstruction did not interfere with the natural flow of their own surface or rain water, nor the regular original channel water of these outlets. There was a canal, immediately west of the levee, which efficiently carried off all ordinary surface water. Unless a levee could be built across these depressions and bayous, it would be ineffective for the purpose intended, and protection against the flood waters would be thus denied appellants.

"We do not intend to hold, nor to leave the impression, that there can be no recovery for obstructing and diverting the regular flow of natural running streams, or for collecting and diverting surface or rain water to the injury of another."

It should be observed that in the instant case the borrow-pit ditch, which ran along the west side of the levee corresponds to the "canal immediately west of the levee" mentioned in the foregoing opinion.

There are a multitude of cases dealing with the rights of individuals, of municipalities, and of levee and drainage districts, in protecting or reclaiming lands from overflow. Many are cited in the briefs of counsel. We have, in the main, referred to cases dealing with the question of rights claimed under a constitutional provision, wherein the property involved was situated between the improvement and the streams subject to overflow and

also where, as here, the streams were such as flowed in a wide and flat valley. An interesting description of the lower valley of the Mississippi River is given by Chief Justice WHITE in Jackson v. United States, 230 U. S. 1. c. 3, wherein it is said that the St. Francois basin, beginning at Cape Girardeau, Missouri, is one of the four great basins on the west bank of the Mississippi River. That part of the basin of Black River here under consideration, is virtually also a part of the St. Francois basin, so nearly so at least, that according to the evidence in this record the flood waters of the Black River sometimes have reached and gone into the St. Francois River, and also the reverse has happened. Under the facts in this case, giving effect, as we must do, to the evidence for the plaintiffs, and in view of the holdings in like situations, we have reached the conclusion that what was done here by the defendant in its character as a governmental agency, did not transgress the limits of the police power of the State, but was a legitimate exercise of that power, not violative of the provisions of Section 21, Article II, and that whatever injury plaintiffs suffered was not a damage within the meaning of that provision, and defendant cannot be held liable therefor. Accordingly, the judgment herein is reversed. *Seddon, C.,* concurs.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur, except *Atwood, J.,* not sitting; *Graves, J.,* in the result.