(No. 6915.  February 4, 1942)

DONALD M. SCOTT, Respondent, v. JOSEPH L. WAT-
KINS, EMMA WATKINS, ROSCOE WATKINS,
EVERETT WATKINS and REED WATKINS, Ap-
pellants.

(122 Pac.  (2d)  220)

Rehearing denied March 2, 1942.

Scatterday & Scatterday and Walter Griffiths, for Appellants.

Martin & Martin, for Respondent.

HOLDEN, J.—Plaintiff and respondent is the owner of the SE¼ of Section One, Township 5 North, Range 6 West, Boise Meridian, located in Canyon County, Idaho; and defendants and appellants are the owners of the NW¼ of that section and other lands adjoining and lying west and north of lands owned by respondent. Prior to respondent's ownership of the said SE¼, that tract was owned by Walter Stutheit.

It appears a waterway, in the evidence frequently called both "Shuck Slough" and "Chuck Slough," with its source in lands lying east and south of plaintiff's lands, enters his lands on the south side, west of the center of the tract, east and west, and then runs northerly and northwesterly through its entire length, leaving it at a point just east of the northwest corner of respondent's tract, being the center corner of the section, thence entering the SW¼ of the NE¼ of said Section One (owned by one Bill Bonner), thence running a very short distance north, thence crossing the east line of the SE¼ of the NW¼ of said section, thence running northwesterly and then northeasterly, emptying into the west side of the Boise River from the lands of appellants. In the spring of 1937 appellants began the construction of a

rock and earthen dam across this waterway, continuing the construction of the same in the spring of 1938. This dam was constructed across the waterway on the north and south center line of said Section One. The NW¼ of the SW¼ of Section One, owned by respondent, and the SE¼ of the NW¼, owned by appellants, apparently "corner" near the south end of the dam. In the spring of 1937 while Stutheit still owned the SE¼ of said Section One (he conveyed it to respondent in September, 1937), one of the appellants, Roscoe Watkins, a son of appellant Joseph L. Watkins, had a conversation with Stutheit about the construction of the dam, following which appellants proceeded to construct the dam. In 1938 and again in 1939 some of the lands of respondent were flooded, allegedly damaging certain crops growing on approximately 14 acres of respondent's lands. June 14, 1939, respondent Scott commenced this action against the Watkins' to recover damages for the loss of the crops and for certain injunctive relief, to-wit, to enjoin defendants and appellants from maintaining the dam, and other relief. The cause was tried to the court sitting without a jury, following which findings of fact and conclusions of law were made and filed and judgment entered thereon for damages in the sum of $280.00. The court also ordered and directed that the dam be removed from across the channel of the stream, or, in lieu thereof, that a permanent opening or conduit be constructed under and through the dam of sufficient size to carry the waters of the stream. Thereafter the defendants moved for a new trial and same being denied prosecuted an appeal from the order denying a new trial as well as an appeal from the judgment awarding damages and granting the above mentioned relief.

The propositions upon which appellants appear to rely chiefly are:

First, that the complaint does not state facts sufficient to constitute a cause of action in that appellants insist "it is alleged in the complaint that defendants obstruct the flow of flood waters overflowing the banks of Boise river from flowing through an old abandoned

channel of the Boise river." Here is what respondent alleges in his complaint:

"That there is a natural stream or waterway (unnamed so far as plaintiff is informed), which has its source in the lands lying a short distance east and south of plaintiff's lands, and runs generally in a northwesterly direction. That said natural stream and waterway enters the plaintiff's lands on the south side, west of the center of the tract east to west, and runs through the entire length of plaintiff's said lands, leaving the same at a point a short distance south and east of the northwest corner of plaintiff's lands, and enters the lands of the defendants, to wit: the northwest quarter of said "Section 1, and then continues to run in a northerly and westerly direction through the lands of the defendants and empties into the west side of the Boise River from the lands of said defendants. That said stream or waterway has a wide and sufficiently deep channel in its natural condition to carry off all of the water which runs in said stream from year to year, since said section of the country was first settled and cultivated,"

and

"That sometime in the late fall of 1937, and continuing in the spring of 1938 and again in 1939, the defendants have constructed a rock and earthern dam across said stream or waterway, along the line between the plaintiff's land and the defendants said lands, without an opening sufficient to permit the passage of the water flowing in said stream or waterway, and has dammed up the same and held said water above said dam in varying depths, but at some periods of the year from five to seven feet deep, flooding approximately ten acres of plaintiff's lands, and backing up said stream, holding the water near the top of the banks of said waterway or stream to a point some four or five hundred feet south of the west line of plaintiff's said land, and seeping and water-logging the lands of the plaintiff lying along the sides of said stream for quite a large distance on each side of said stream. Said water raised by said dam has also washed and eroded plaintiff's lands."

It will be observed instead of alleging that appellants obstructed the flow of flood waters "flowing through an old abandoned channel of the Boise river," respondent very expressly alleges that appellants constructed a rock and earthen dam across a certain stream or waterway, describing it, and by the construction of such dam obstructed the flow of water in that stream or waterway, not "in an old abandoned channel of the Boise river." Moreover, we have very carefully examined the entire complaint without finding a single hint or reference to "an old abandoned channel of the Boise river."

Secondly, that the evidence is insufficient to support the finding of the trial court that permission was given to construct the dam "on the condition that a box or opening should be placed under said dam at the bottom of said stream of sufficient size to carry the water of the said stream."

Walter Stutheit testified:

Q. "Did you have a conversation with Mr. Watkins, or with persons—did you have a conversation with anybody with regard to a fill being put across this slough near the center of Section One?

A. "I did.

Q. "Who did you have a conversation with about that?

A. "Roscoe Watkins and Ewing Gardner.

Q. "Who is Roscoe Watkins?

A. "Joe Watkins' son.

Q. "What was the conversation you had with these parties with regard to this fill?

A. "Well, he asked me if I would object to putting a fill across there so they could irrigate that land on the north side there, and I told them, no, if they would put a box in there sufficient to carry the slough water."

Ewing Gardner, present during the conversation touching the matter of obtaining permission to construct the dam in question, testified:

Q. "Now who owned the Scott land at the time you started to build this ditch in the spring of 1937?

A. "Walter Stutheit.

Q. "Did you have an arrangement, or agreement with

Mr. Stutheit in regard to constructing that dam across there?

A. "Yes, sir, in a way. I saw Mr. Stutheit before we commenced work, and asked him if he objected to making a fill across there to make a ditch, and he said, no, if we would put in a pipe, or spillway that would take care of the waste water."

Appellent Roscoe Watkins testified on direct examination:

Q. "Did you have something to do with the construction of a fill across Shuck Slough at the southeast corner, near the center of Section One?

A. "Yes, in a way. Everett done most of the work; my brother, he done the work. I wasn't around there much at the time.

Q. "Did you consult the owners of the land adjoining there before—

A. "I believe I did. We didn't figure on no trouble and we never thought such a great deal about it.

Q. "Do you remember consulting Mr. Stutheit?

A. "Yes, sir.

Q. "He was agreeable to have the fill put in?

GEN. MARTIN: "We object to that as leading and suggestive.

THE COURT: "Objection sustained.

Q. (By Mr. Griffiths) "What did Mr. Stutheit say in regard to that?

A. "He said to go ahead and build it; something that way.

On cross examination:

Q. "You say you talked to Mr. Stutheit about putting in this fill?

A. "Yes.

Q. "And you say he consented; what did he say?

A. "Well, you know, I never figured—at the time I never paid much attention, because, as I told you, my health was bad, and you know how it is when a person is ill; so much to think about, you don't think much about anything, but he said, go ahead and put it in.

Q. "What did he say about putting in a box to carry away the water, or a pipe?

A. "To put in a pipe there to let that water on through.

Q. "He said if you would put in a pipe—he said pipe, didn't he—if you would put in a pipe?

A. "I don't remember, to tell you the truth.

Q. "Let me finish my question. He said if you would put in a pipe big enough to carry the water off, he had no objection to you putting in the fill?

A. "Well, I don't know that he said a pipe or box. He might have, too.

Q. "But you were to put one in there big enough to carry off the water. That was the agreement?

A. "Yes, sir."

Thirdly, that the evidence is insufficient to support the finding of the trial court "that said stream [referring to the stream in question here] has a well defined channel and bed, with high banks and in its natural condition is sufficiently large to carry all the water which comes into said stream from year to year."

Lee R. Cooke, civil engineer, called in behalf of respondent, testified:

Q. "Now just describe the slough in a general way, or stream, from the time it enters Section 1 until it passes under the dam.

A. "Well, it is apparently a natural water-way; runs all the way from twenty to fifty feet wide between banks; pretty much over-grown with tules, and the water meanders around through those tules.

Q. "Did you take elevations as to the top—the bottom and top of the bank?

A. "Yes, sir.

Q. "What would you say as to the kind of banks; how high are they?

A. "Well, in this portion right through here (Indicating), the bank is rather low. As it goes up farther it gets more defined. The average elevation up through this section is around three feet."

Donald Scott, respondent, testified:

Q. "Now calling your attention to this fill, or dam that the defendant put in there across the stream that runs through your land, as shown by Exhibit 'A,' just

describe that stream, commencing at the head down to the dam.

A. "It starts about right at the west side of R. H. Young's ranch.

\*   \*   \*   \*   \*   \*   \*   \*   \*

Q. "Now about what width is that stream, commencing say half a mile east of your land—south of your land, south and east and then running on down?

A. "Well, there is different widths.

Q. "Tell us about it.

A. "I would say it is around 40 feet wide, 30 to 40 feet wide.

Q. "From top of the bank to top of the bank?

A. "Yes, sir.

Q. "Now about what height will the banks average?

\*   \*   \*   \*   \*   \*   \*   \*   \*

A. "I would say about three feet, three to four feet.

Q. "How about the bottom of the ditch or slough, or stream; is a wide flat bottom; what kind of a bottom does it have?

A. "It is wide in places and then it narrows up in places.

\*   \*   \*   \*   \*   \*   \*   \*   \*

Q. "Does it run some water all the time?

A. "It does.

\*   \*   \*   \*   \*   \*   \*   \*   \*

Q. "It is never dry; it is always running?

A. "Yes, sir."

Noah House, called by respondent, testified:

Q. "Now you say there was a large volume of water at times going through the culvert that "crosses the road on the south boundary line of Section 1?

A. "Yes, sir.

Q. "Where did that water come from?

A. "It came from the west; off the irrigation land above that.

Q. "Was it waste water or was it just excess water carried on to that land?

A. "The biggest share of it was waste water, but it runs water all the time even when there is no irrigation. That is a creek."

William Kniefel, former Canyon County Commissioner, called by respondent, testified:

Q. "Now do you know this stream that has been referred to, that takes out somewhere east and south of the Scott land and runs down across the west part of the Scott land?

A. "Yes.

Q. "How long have you known that?

A. "Why I know that creek has been there ever since I have been in the country, going back and forth once or twice a year may be.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Q. "Does this slough or creek have water in it the year around?

A. "Yes, to a certain extent.

Q. "And it has a current and flows along?

A. "Yes, sir.

Q. "Well defined banks?

A. "Well, next to the water level there is probably 18 inches and out next to the farm land probably 3 or 4 feet.

Q. "That is the bottom of the creek is 3 or 4 feet below the level of the land?

A. "Yes, sir.

Q. "Are the banks straight up, abrupt, or sloping?

A. "Sloping up mostly."

Montie Scott, father of respondent, testified:

Q. "I suppose you have been acquainted with this stream or slough—Shuck Slough, is that what they call it; Shuck Slough, I suppose you have been acquainted with it ever since you have lived there?

A. "Yes, sir. We call it a creek because it is running water."

In *Hutchinson v. Watson Slough Ditch Co.*, 16 Idaho 484, 101 Pac. 1059, the identical proposition under

discussion was squarely presented. In that case the trial court instructed the jury (the instruction being approved by this court) as follows:

"The jury is instructed that a watercourse is a stream of water flowing in a definite channel, having a bed and sides or banks, and discharging itself into some other stream or body of water. The flow of water need not be constant, but must be more than mere surface drainage occasioned by extraordinary causes; there must be substantial indications of the existence of a stream, which is ordinarily a moving body of water."

27 R. C. L., Sec. 3, p. 1062:

"Watercourse is frequently defined as a stream flowing in a bed with banks. This definition is, for most purposes, sufficient; but a too strict adherence to it has caused trouble in some cases. A somewhat similar definition is that it consists of a channel with banks and bed, and running water."

67 C. J., Sec. 3, p. 676:

"While it has been said that no definition of a natural watercourse can be given that will apply to all cases, in general a natural watercouse is one made by the natural flow of the water caused by general superficies of the surrounding land from which the water is collected into one channel. Surface water becomes a natural watercourse at the point where it begins to form a reasonably well defined channel, with bed and banks or sides and current, although the stream itself may be very small, and the water may not flow continuously."

Same volume, Sec. 4, p. 677:

"In determining whether a stream is a natural watercourse its size is not a material element in respect of the volume of water carried, and while the element of permanence is necessary, great age is not an essential attribute of a watercourse."

Same volume, Sec. 5, p. 678:

"The particular source is immaterial. Thus the supply of a natural watercourse may come from springs, swamp, surface water, artificially controlled water over which the creator has lost control, artesian wells, lake, or a

pond formed by surface water, the overflow of a lake because of rainfall, or from a glacier."

Fourthly, that "every land owner along a stream has a right to take all necessary steps required to protect his land and property against damages from 'vagrant waters.'" In support of that contention appellants cite and rely upon *Lamb v. Reclamation District No. 108,* 73 Cal. 125, 14 Pac. 625; *Horton v. Goodenough,* 184 Cal. 451, 194 Pac. 34; *Fischer v. Davis,* 24 Idaho 216, 133 Pac. 910. In the Lamb case, supra, it appears Reclamation District No. 108 constructed a levee along the west bank of the Sacramento river, *a large navigable stream,* and across a place on said bank called Wilkins' Slough. The district was a public corporation organized and existing under the laws of the state of California "relating to swamp and overflowed lands." It embraced 40,000 acres in Yolo County and 33,000 acres in the adjoining county of Colusa. The levee complained of in that case was completed December 1, 1872. It was admitted that the levee, including that part of it constructed across Wilkins' Slough, was necessary and indispensable to the protection of the lands of the district from overflow and that without such protection the overflow would render such lands unfit for cultivation and uninhabitable. On or about the 6th day of April, 1880, the levee caused the water of the Sacramento river to overflow and "destroy Lamb's crops to his alleged damage in the sum of $5,000.00." The court said:

"The real question in such cases is: Had the party sued the right to do the thing complained of? Respondent has, at least, as much right to maintain the levee as a natural person owning lands of a character similar to those of respondent's district would have; and its counsel bases its defense (1) upon the right of a natural person to protect his lands from overflow, upon the principle of self-defense, as held in *Rex v. Commissioners,* 8 Barn, & C. 355; and (2) upon its right as a public municipal corporation organized under the laws of the state, exercising the police powers of the state, and acting as a public instrumentality of the state in providing for the public welfare, and in complying with the conditions upon

which the grant of swamp and overflowed lands was made to the state by the general government."

Continuing:

". . . counsel for appellant have argued the case almost entirely upon the theory that respondent is a municipal corporation acting under the authority of the state; and that, therefore, although exercising the power of the state, it is bound, like the state, by the constitutional limitation that private property cannot be taken for public use without compensation. This view of the case rests upon the assumption that building the levee, and thereby subsequently causing the damage complained of, was done under the power of eminent domain; and that, therefore, appellant was entitled to compensation for the 'taking' of his land. But, assuming the theory to be correct, the position is clearly untenable. In the first place, when respondent built the levee, it could not possibly have condemned appellant's land under the power of eminent domain. It could not have shown that it had any use for said land, or intended to use it, or even to damage it, or to interfere with it in any way; and then the subsequent damage which happened years afterwards, was not a 'taking' within the meaning of the most extreme cases on that subject. It was in the extreme sense, indirect, remote, and consequential. There was no physical directness between the act and the damage. It cannot be claimed that the water which the levee prevented from going over and through the west bank of the river was the *very water* which afterwards flowed onto appellant's land. It was remote and indirect in point of place and distance; it took place two miles away, and on the opposite side of a large navigable river. It was indirect, remote, and consequential in point of time; it took place more than seven years after the act complained of. And there was nothing in the nature of a permanent use or occupation of the land; it was a mere temporary overflow, which occurred once in seven years, and it is impossible to know when, if ever, it will occur again, or with how small an effort appellant could make its recurrence improbable or impossible. It is therefore one of the plainest cases for the application of the well-established rule that the state is

not liable for remote and consequential damages caused by the erection of public works. . . .

"Under these views, it is unnecessary to discuss the distinction made by counsel for respondent between 'eminent domain' and the 'police powers' of a state. The right and duty of the state, acting for the public benefit and the general welfare, and by means of municipal corporations like the respondent, to reclaim the swamps and overflowed land granted to it by the Arkansas act, we do not understand to be disputed. *Kimball v. Reclamation Fund Com'rs,* 45 Cal, 344; *Hagar v. Yolo Co.,* 47 Cal. 222; *People v. Reclamation District 108,* 53 Cal. 346; *Dean v. Davis,* 51 Cal. 406. And counsel for respondent argues that this right is exercised under the police powers of the state, and that, therefore, appellant would not have been entitled to compensation even if his property had been 'taken.' But, as the land of appellant was not taken, we need not follow the point here made by respondent. Under either view, respondent is not liable for the remote and indirect damage."

In the Horton case, supra, plaintiff sought to enjoin the continued maintenance by defendants of certain small structures which the latter built for the purpose of preventing water from flowing onto their lands. While the court held that one has a right to protect himself against flood waters "and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another," it further held that "one may not obstruct or divert the flow of a natural watercouse. But by 'watercourse' is not meant the gathering of errant water while passing through a low depression, swale, or gully, but a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow." It is apparent that neither the Horton nor Lamb case, supra, is in point here; but appellants insist that the stream in question is in reality but a channel of the Boise river and that this court in the Fischer case, supra, "has taken judicial notice of the fact that the Boise river is a 'vagrant stream,'" hence, that they had a right to construct a dam

across the stream in question in the case at bar. In the Fischer case it appears that in the years 1908, 1909 plaintiff constructed on his lands an embankment adjacent to the Boise river and along the easterly side for the purpose of protecting his lands from erosion and from being washed away during high water periods and that the erection and maintenance of such embankment by the plaintiff did not injure the lands of the defendants. It further appears that in the spring of 1910 the defendants constructed certain cribbing on the westerly side of Boise river at a point opposite the southerly end of a gravel bar, for the purpose of protecting their lands from erosion and from being washed away during the high water period of the river, that the river at the point where the cribbing was constructed was about 362 feet wide and that the cribbing extended into the channel a distance of about 74 feet and at an angle of about 45 degrees and that the construction and maintenance of the cribbing did not injure the lands of the plaintiff. It is pointed out that the riprapping followed the natural course of the bank in all its curves and angles, the purpose of its construction being to turn the water in the direct general course of the stream and prevent erosion. In the course of its discussion the court said that while the Boise river. " . . . carries a considerable volume of water especially during the high-water season, still it is a vagrant stream with low banks where it traverses the valley and is constantly changing its channel in flowing through and over a sandy and gravelly formation. . . . In order for those who are using their land along the stream to be able to improve the same with any assurance of obtaining results or any degree of safety, it is necessary to protect the banks from erosion either by means of cribbing, rip-rap, or stockades. . . . A stream of this kind and character must be dealt with differently from the ordinary river with a fixed and permanent bed and well-defined banks and channel, and the courts must take the physical facts and conditions into consideration in rendering decisions with reference thereto.

"Another thing which the court will take into consideration in entering judgments with reference to this

stream is that large reservoirs have been constructed by the government reclamation service for impounding water from this stream during the high-water season, and that another large reservoir is being constructed some 23 miles above Boise City, which it is estimated will collect the entire surplus flow of the Boise river during the high-water period. When these projects are completed, there will no longer be any particularly high-water season in the Boise river below the points of diversion, and for that reason it would hardly seem necessary for a court to cause these cribbings, embankments and stockades to be removed which are so placed that they do not cause damage to other riparian proprietors and where they will not in all probability cause injury or damage in the future.

Even though the Boise river were still a "vagrant stream" as this court held it was in 1913 in the Fischer case that would not mean it is a "slough," as that word is commonly understood, nor that the Boise river is a stream across which a riparian proprietor could construct a dam and back the waters and overflow the lands of adjacent riparian proprietors. In saying this we must not be misunderstood. We fully adhere to the rule held in the Fischer case. Under that rule, however, one may not, as appellants here did, construct a dam across a stream with well-defined banks and thereby back the waters up and cause them to waterlog his neighbor's lands, damaging his crops.

Fifthly, that the actual cause of the water damage to respondent's lands was the elevation of the water in Boise river. The evidence shows that the size of the drain box put under the dam was $8\frac{1}{4}$ inches x 11 inches, inside measurement. It was set in the bed of the stream about a foot higher than the lowest point of the creek bed. It had a grade of .3 of a foot through the dam. There are various estimates of the carrying capacity of the box. The court found it to be 65 inches without pressure other than the natural grade of the stream. The evidence further shows the normal flow of the stream, including irrigation water, is approximately 500 inches. It is clear the water flowing in the stream in excess of the discharging

capacity of the drain box would necessarily be backed up, and it is likewise clear that that could not happen in the absence of the dam. Furthermore, the continued backing up of the waters of this stream would eventually result, as it did, in waterlogging and in damaging lands and crops.

Sixthly, that the trial court erred in refusing to grant appellants a new trial. The granting or denying of a new trial upon the ground of newly discovered evidence is in the sound legal discretion of the court. *Hall v. Jensen,* 14 Idaho 165, 93 Pac. 962; *State v. Fleming,* 17 Idaho 471, 505, 106 Pac. 305; *State v. Grant,* 26 Idaho 189, 140 Pac. 959; *Seamons v. Davis,* 34 Idaho 393, 201 Pac. 716; *Garavelis v. Cacavas,* 38 Idaho 123, 220 Pac. 110; *Hansen v. Standard Oil Co.,* 55 Idaho 483, 505, 44 Pac. (2) 709. We have carefully examined the showing by appellants made in support of their motion for a new trial, from which we conclude the trial court did not abuse the discretion vested in it in denying the motion.

From what has been said it follows the judgment and order appealed from must be affirmed, and it is so ordered, with costs to respondents.

Givens, C.J., Budge, Morgan, and Ailshie, JJ., concur.